**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>KidsPeace Corporation,[1]<br><br>             Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace Children's Hospital,<br><br>             Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace Mesabi Academy, Inc.,<br><br>             Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace National Centers, Inc.,<br><br>             Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace National Centers of Georgia, Inc.,<br><br>             Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: KidsPeace Corporation (3394); KidsPeace Children's Hospital, Inc. (4910); KidsPeace Mesabi Academy, Inc. (4179); KidsPeace National Centers, Inc. (4908); KidsPeace National Centers of Georgia, Inc. (7440); KidsPeace National Centers of New England, Inc. (1326); KidsPeace National Centers of North America, Inc. (4765); Iron Range School, Inc. (0561); and KidsPeace National Centers of New York, Inc. (1888). The Debtors' address is 5300 KidsPeace Drive, Orefield, Pennsylvania 18069.

| | |
|---|---|
| In re:<br><br>KidsPeace National Centers of New England, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace National Centers of North America, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| n re:<br><br>Iron Range School, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace National Centers of New York, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |

## DECLARATION OF WILLIAM R. ISEMANN IN
## SUPPORT OF FIRST DAY MOTIONS FOR RELIEF

I, William R. Isemann, hereby state that the following is true to the best of my knowledge, information, and belief.

1.      I am President and Chief Executive Officer of each of the above-referenced debtors (the "Debtors") and am familiar with the Debtors' assets and liabilities, operations and business affairs.  I have held my current positions since the resignation of the Debtors' prior

31848-17                                          2

chief executive officer in September 2008 and, prior to my appointment, served as Executive

Vice President and Chief Financial Officer.  Except as otherwise indicated, all facts set forth in

this Declaration and the First Day Pleadings (as defined below) are offered to the best of my

knowledge, information, and belief, and are based upon my personal knowledge, my review of

relevant documents, information provided to me by the Debtors' management or professionals

working with me or under my supervision, or my informed opinion based upon my experience

and knowledge of the Debtors' industry, operations, and financial condition.  If I were called

upon to testify, I could and would testify competently to the facts set forth herein and the First

Day Pleadings (as defined below).  I am authorized to submit this Declaration on behalf of the

Debtors.

2.       On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code").  To enable the Debtors to operate effectively and preserve the value of

estate assets, the Debtors have requested various types of relief in "first-day" applications and

motions filed with this Court contemporaneously herewith (the "First Day Pleadings").

3.       I submit this Declaration in support of the First Day Pleadings.  Any capitalized

term not defined herein shall have the meaning ascribed to such term in the relevant First Day

Pleadings.  The First Day Pleadings seek, among other things, to: (a) ensure the continuation of

the Debtors' cash management system and other business operations without interruption, (b)

maintain employee morale and confidence, and (c) establish certain other administrative

procedures to promote a smooth transition into Chapter 11.  Gaining and maintaining the support

of the Debtors' employees, customers, vendors, and other key constituencies, as well as

maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be critical to the Debtors' reorganization.

4.      Part I of this Declaration describes the Debtors' business and the circumstances surrounding the filing of the chapter 11 petitions.  Part II sets forth the relevant facts in support of the First Day Pleadings.  Part III concludes that the relief requested in the First Day Pleadings is in the best interests of the Debtors and their creditors and estates, and therefore, should be granted.

## PRELIMINARY STATEMENT

5.      The Debtors are nonprofit corporations, whose primary mission is: "To give hope, help and healing to children, families and communities."  The Debtors, the operators of a unique psychiatric hospital and the providers of a comprehensive range of residential treatment programs, regular and special educational services, and a variety of foster care and community-based treatment programs to help children, adolescents and young adults, filed these Chapter 11 Cases (i) as a means to implement a negotiated restructuring of bond debt currently aggregating approximately $51,310,000 plus accrued interest to a reduced amount of approximately $24 million, as more particularly discussed below, and (ii) to continue on-going negotiations with the Pension Benefit Guaranty Corporation (the "PBGC") in hopes of reducing the PBGC asserted obligation of $100+ million to an amount that the Debtors can reasonably expect to satisfy.

6.      Leading up to the Chapter 11 Cases, the Debtors have maintained exemplary patient care, which has not been affected, and anticipate that such exemplary care will continue. The Debtors have maintained more than sufficient cash to satisfy day-to-day operations and expenses and anticipate that they will continue to do so, especially in light of the debtor in possession financing commitment from Healthcare Finance Group, LLC ("HFG").  Both the

Bond Trustee (as defined below) and the PBGC recognize the importance of continuing with the exemplary patient care and maintaining satisfactory day-to-day operations.  These Chapter 11 Cases were commenced primarily to restructure the future debt associated with the 1998 Bonds, the 1999 Bonds (each as defined below) and the PBGC.  This restructuring can only be accomplished through a chapter 11 filing.

## PART 1: BACKGROUND

### A.    General Background

7.    KidsPeace Corporation ("KP Corp."), which is located in Orefield, Pennsylvania, is a nonprofit corporation organized under the laws of the Commonwealth of Pennsylvania.  KP Corp. traces its roots to the Thurston Home for Children, an unincorporated orphanage established in 1882 in Bethlehem, Pennsylvania. In 1886, the Thurston Home for Children was incorporated under the laws of the Commonwealth of Pennsylvania. As part of the original Articles of Incorporation, the organization's name was changed to the Children's Home of South Bethlehem. In 1926, the corporate name was changed to the Children's Home of Bethlehem and Allentown, and again in 1975, to Wiley House. Finally, in 1992, through Articles of Amendment, the corporate name was changed to KidsPeace Corporation.

8.    KP Corp., through its subsidiary corporations, operates a unique psychiatric hospital, the KidsPeace Children's Hospital (the "Hospital"), and also provides a comprehensive range of residential treatment programs, regular and special education services, and a variety of foster care and community-based treatment programs to help children, adolescents and young adults overcome challenges and transform their lives.   KP Corp., through its subsidiary corporations, provides mental, emotional and physical health care and educational services in an atmosphere of teamwork, compassion and creativity.

9.      KP Corp. operates through six "subsidiary" nonprofit Pennsylvania member corporations and one "subsidiary" nonprofit New York Corporation.   KP Corp is the sole member of each corporation.   Except for employees of KidsPeace Mesabi Academy ("KPMA"), all full-time and part-time employees are employed by KP Corp., regardless of which subsidiary operates a particular program.   All full-time and part-time employees at KPMA are employed by KPMA.   There is also one inactive subsidiary corporation that provides no services or programs. The eight subsidiary corporations are as follows:

a.      *KidsPeace Children's Hospital, Inc. (Pennsylvania Corporation)* – This Corporation was formed in 1991 and oversees the Hospital programs (discussed below), Pennsylvania Community Programs (with the exception of the Berks County Community Programs) and Behavioral Health Rehabilitation Wraparound Services.

b.      *KidsPeace Mesabi Academy, Inc. (Pennsylvania Corporation)* – This Corporation was formed in 1998 and oversees Mesabi Academy in Buhl, Minnesota, and Prairie Academy, in Worthington, Minnesota (currently closed).  Mesabi Academy provides a juvenile justice residential program with a clinical component.

c.      *KidsPeace National Centers, Inc. (Pennsylvania Corporation)* – This Corporation was formed in 2000 and oversees the Orchard Hills Residential Campus, Pennsylvania Foster Care, Berks County Community Programs and Pennsylvania Schools.

d.      *KidsPeace National Centers of Georgia, Inc. (Pennsylvania Corporation)* – This Corporation was formed in 2003 and oversees the Residential Campus in Bowdon, Georgia.

e.      *KidsPeace National Centers of New England, Inc. (Pennsylvania Corporation)* – This Corporation was formed in 2006 and oversees all Maine programs, including the Graham Lake Residential Campus in Ellsworth, Maine, and Maine Foster Care.

f.      *KidsPeace National Centers of North America, Inc. (New York Corporation)* – This Corporation was formed in 1993 and oversees all Foster Care programs, with the exception of Pennsylvania and Maine Foster Care.

g.      *Iron Range School, Inc. (Pennsylvania Corporation)* – This Corporation was formed in 2000 and oversaw the schools at Prairie Academy and

Mesabi Academy.  Prairie Academy is currently closed, and the Mesabi Academy clients are now being educated by the Mt. Iron Buhl School District.

h.     *KidsPeace National Centers of New York, Inc. (New York Corporation)* – This Corporation was formed in 1999, is currently inactive, and provides no programs or services.

Annexed hereto as Exhibit "A" is an organizational chart referencing all of the Debtors.[2]

## B.     KidsPeace Hospital Services

10.     KP Corp., through its subsidiary KidsPeace Children's Hospital, Inc., operates the Hospital, an acute psychiatric facility that provides healthcare services to children ages 4 to 18 and young adults ages 18 to 21 from Pennsylvania and surrounding states.  At present, the Hospital is licensed to operate 96 beds, and it is currently staffing at that level.  The Hospital provides a full range of in-patient and out-patient psychiatric treatment programs for children, adolescents, and young adults.

11.     KP Corp. employs approximately 261 full and part-time employees, including approximately 97 nurses, and has 8 affiliated physicians.

## C.     KidsPeace Residential and Educational Services

12.     KP Corp., through four of its subsidiaries, operates residential treatment facilities in Pennsylvania, Maine and Georgia, as well as a juvenile justice residential facility in Minnesota.  KidsPeace National Centers, Inc. operates the residential program in Pennsylvania, KidsPeace National Centers of New England, Inc. operates the residential program in Maine,

---

[2]     Prior to the Petition Date, there were 5 additional affiliated subsidiaries: KidsPeace National Centers of Pennsylvania, Inc. (a Pennsylvania corporation); Martin Hughes School, Inc. (a Minnesota corporation); KidsPeace School of Georgia, Inc. (a Georgia Corporation); National Family Resource Center, Inc. (a Pennsylvania corporation); and KidsPeace Services, Inc. (a Pennsylvania corporation).  All of these subsidiaries have been inactive since 2009.  KidsPeace National Centers of Pennsylvania, Inc. was merged into KidsPeace National Centers, Inc.; Martin Hughes School, Inc. was merged into KidsPeace Mesabi Academy, Inc.; KidsPeace School of Georgia, Inc. was merged into KidsPeace National Centers of Georgia, Inc.; National Family Resource Center, Inc. was merged into KidsPeace Corporation; and KidsPeace Services, Inc. was merged into KidsPeace National Centers of North America, Inc.

KidsPeace National Centers of Georgia, Inc. operates the residential program in Georgia, and KidsPeace Mesabi Academy, Inc. operates the juvenile justice program in Minnesota. The residential programs vary in intensity and address a variety of diagnoses including behavior disorders, depression, anxiety, emotional problems, low IQ with mental disorders, male sexual issues, attention deficit hyperactivity disorder, autism, and a variety of other diagnoses that require 24-hour treatment and monitoring, as well as classroom time to allow clients to keep up with their school work. The juvenile justice facility services delinquent and non-delinquent males, many of whom are referred by the juvenile justice system. This facility offers several levels of secure and non-secure care, diagnostic services, residential programs, sexual issues treatment, a fire-setter program, and aftercare to reduce recidivism.

13.     KP Corp., through three of its subsidiaries, provides educational services in Pennsylvania, Maine, and Georgia. KidsPeace National Centers, Inc. has two schools in Pennsylvania that serve its residential clients and a third school that offers partial hospitalization and specialized mental health/education programs for students requiring emotional support. KidsPeace National Centers of New England, Inc. and KidsPeace National Centers of Georgia, Inc. operate schools on their respective campuses for their residential clients. In Minnesota, the local school district provides on-site schooling for the clients of KidsPeace Mesabi Academy, Inc.

14.     KP Corp. employs approximately 770 full and part-time employees, including 46 nurses and 50 teachers, in Residential and Educational Services and 5 physicians affiliated with Residential Services. KPMA employs approximately 127 full-time and part-time employees for the juvenile justice program.

D.      **KidsPeace Foster Care Services**

15.      KP Corp., through three of its subsidiaries, provides foster care services through 34 offices in 8 states (Indiana, Maryland, Maine, Nevada, New York, North Carolina, Pennsylvania and Virginia) and the District of Columbia.    This service line includes therapeutic/regular foster care, medically fragile care, respite care, diagnostic assessments, adoption, and issue-specific programs.    In Pennsylvania and Maine, the foster care programs are operated by KidsPeace National Centers, Inc. and KidsPeace National Centers of New England, Inc., respectively.    In all other locations, foster care programs are operated by KidsPeace National Centers of North America, Inc.

16.      KP Corp. employs approximately 346 full and part-time employees in foster care. This number does not include foster parents.    KP Corp. also contracts with 740 foster parents who are provided a twice per month stipend whenever foster children are placed in their homes. Foster parents are not employees of KidsPeace Corporation.

E.      **KidsPeace Community-Based Services**

17.      KP Corp., through four of its subsidiaries, provides community-based outpatient services to children, families, and communities at the Pennsylvania, Georgia, and Maine campuses, and through foster care offices across the country.    This service line includes acute partial hospitalization, several autism programs, targeted case management, family and individual counseling, diagnostic services, medication management, nutritional assessments, pediatric evaluations, and many other outpatient treatment opportunities.    In Pennsylvania, Georgia, and Maine, community-based programs are operated by KidsPeace National Centers, Inc., KidsPeace National Centers of Georgia, Inc., and KidsPeace National Centers of New

England, Inc., respectively.  In all other locations, community-based programs are operated by KidsPeace National Centers of North America., Inc.

18.    KP Corp. employs approximately 256 full and part-time employees in community-based programs and has 6 physicians affiliated with the community-based programs.

19.    KP Corp. provides Internet-based services through two portals, TeenCentral.net and ParentCentral.net.  On these sites, teens and parents can raise issues or ask questions and receive guidance from Masters or Ph.D.-level counselors within 24 hours.  The users remain anonymous on these sites, and KP Corp. provides the guidance is provided at no charge.

**F.**    **Recent Financial Operating Results**

20.    The Debtors' annual revenues on a consolidated basis were $123,248,393 for the fiscal year ending on December 31, 2009; $114,151,765 for the fiscal year ending on December 31, 2010; $116,370,155 for the fiscal year ending on December 31, 2011; and $119,927,620 for the fiscal year ending on December 31, 2012.  The Debtors' annual expenses on a consolidated basis were $122,675,885 in 2009; $120,648,428 in 2010; $118,004,981 in 2011, and $124,485,531 in 2012, respectively. Earnings before interest, depreciation and amortization for the Debtors were $9,224,864 in 2009; $1,946,559 in 2010; $6,467,408 in 2011; and $3,114,768 in 2012.

21.    The Debtors had a profit of $572,508 for the one-year period ending on December 31, 2009, losses of $6,496,663 for the one-year period ending on December 31, 2010, losses of $1,634,831 for the one-year period ending on December 31, 2011, and losses of $4,557,911 for the one-year period ending on December 31, 2012.

22.    For the 3 month period ending March 31, 2013, the Debtors' revenues on a consolidated basis were approximately $30,699,949 and their expenses for the same period were approximately $30,931,804.

23.    The Debtors' total assets, as shown on their books, were $97,180,719 in 2009; $93,313,153 in 2010; $90,568,550 in 2011; and $86,666,989 in 2012.   The Debtors' total liabilities, as shown on their books, were $108,661,513 in 2009; $121,504,923 in 2010; $138,705,097 in 2011; and $158,587,999 in 2012.   As discussed in further detail below, the Debtors owe approximately $56,206,821 in bond debt, and they have been told that their pension liability is allegedly about $100,000,0000 of which the Debtors currently reflect $83,049,412 on their books.

24.    Annexed hereto as Exhibit "B" is a summary profit and loss statement and summary balance sheet for each of the years 2009, 2010, 2011, 2012 and for the three months ending March 31, 2013.

**G.    Assets**

25.    The Debtors hold title to real property at the following locations: (a) the National Headquarters building in Schnecksville, Pennsylvania; (b) the Orchard Hills Campus in Orefield, Pennsylvania; (c) the Broadway Campus in Bethlehem, Pennsylvania; (d) the Green Street building in Allentown, Pennsylvania; (e) the Carldon Street building in Allentown, Pennsylvania; (f) the Blue Ridge facility in Saylorsburg, Pennsylvania; (g) the Wilson Sarig building in Temple, Pennsylvania; (h) three vacant lots adjacent to the Orchard Hills Campus in Orefield, Pennsylvania; (i) the Graham Lake Campus in Ellsworth, Maine; and (j) the Bowdon Campus in Bowdon, Georgia.

26.     The National Headquarters building, in Schnecksville, Pennsylvania, sits on a 5.756 acre site.  The building is a 30,228 square-foot, single-user office building built in 2002. The appraised value as of February 2, 2012 was $3,200,000. The Debtors have a remaining mortgage of $1,224,692 on this property.

27.     The Orchard Hills Campus sits on a 261 acre site.  This campus consists of multiple permanent structures, including the 96-bed hospital, residential units, educational facilities and physical plant buildings.    The appraised value as of October 20, 2012 was $22,100,000.  As discussed in more detail below, the Orchard Hills Campus may be encumbered by liens approximating $7,100,000 in favor of the PBGC (the "PBGC Liens"), which the PBGC has advised may be reduced to approximately $5,700,000, and a mortgage in the amount of $15,000,000 held by the Bond Trustee on behalf of the holders of the 1998 Bonds and the 1999 Bonds.

28.     The Broadway Campus sits on a 5.9 acre site. This campus consists of multiple permanent structures, including the original Wiley House orphanage, residential units and an outpatient treatment center.  The appraised value as of October 30, 2012, 2012 was $4,700,000. This property may also be subject to the PBGC Liens.

29.     The Graham Lake Campus sits on a 10 acre site. This campus consists of multiple permanent structures, including residential units and educational facilities.  The appraised value as of December 28, 2012 was $420,000.  This property may also be subject to the PBGC Liens.

30.     The Bowdon Campus sits on a 7.5 acre site. This campus consists of multiple permanent structures, including a residential unit, educational facilities and a recreation center.. There is no appraisal for this property. As discussed below, this property is subject to a mortgage

in the approximate amount of $2,910,000 in favor of the Georgia Bond Trustee and also may be subject to the PBGC Liens.

31.     There are no appraisals for the Green Street building, the Carldon Street building, the Wilson Sarig building, the Blue Ridge facility, or the three vacant lots adjacent to the Orchard Hills Campus.

32.     The Debtors hold leases to real property at 35 locations in eight states and the District of Columbia, including a lease of the Mesabi Academy and Prairie Academy in Minnesota, at a cost to the organization of approximately $2.6 million on an annual basis.

33.     Currently, the Debtors' cash on hand is approximately $5.7 million.

34.     Currently, the Debtors' cash receivables are approximately $28 million.

**H.     Debt Structure**

35.     The Debtors' primary debts are the following:

     a.     Gemino

         i.     A loan pursuant to a credit agreement dated September 14, 2009 (as amended from time to time) with Gemino Healthcare Finance ("Gemino") for a $7,500,000 line of credit, which is secured by a first priority position on the Debtors' accounts receivable, worth approximately $28 million. The current outstanding amount on the Gemino line is approximately $4 million. Gemino, KP Corp., KPCH, KPNC, and the Bond Trustee entered into a Subordination and Intercreditor Agreement dated as of April 6, 2010 (as amended from time to time) that governs the rights and remedies of Gemino and the Bond Trustee (as defined below), respectively, to each party's individual secured collateral.

        ii.     Interest on outstanding borrowings accrues at the London Interbank Offer Rate ("LIBOR") plus 5.25%, subject to a 3.0% LIBOR floor, which is currently 11.25% including default interest rate.   Under the terms of the Credit Agreement, the Debtors maintain two lockbox accounts at a bank for collection receipts. The principal amount of the credit line is settled weekly from the lockbox accounts, and excess receipts are returned to the Debtors' operating account.  Accrued interest and fees are settled monthly.

iii.    Subsequent to the filing of the PBGC Liens, Gemino placed a lien reserve initially in the amount of $2,950,000 lien reserve in or about March 2012 and then an increased lien reserve of $4,095,016 in or about December 2012 on the weekly Borrowing Base reports. These reserves in the borrowing base calculation lowered the amount of funds that could be borrowed.

iv.    Upon Gemino's receipt of notice of the PBGC Liens, Gemino retained legal counsel, Parker, Hudson, Rainer & Dobbs LLP of Atlanta, Georgia. The Debtors, the PBGC, the Bond Trustee and Gemino commenced negotiations for the subordination of the PBGC Liens to the Credit Agreement. The negotiations resulted in the entry into the PBGC Subordination and Intercreditor Agreement dated January 10, 2013, which, *inter alia*, provided that the PBGC Liens would be subordinated to the Credit Agreement and also subordinated to the Bond Trustee's interest in the Obligated Group's receipts.

v.    The Gemino line matured; however, Gemino has been providing extensions. Upon being advised that the Debtor would be replacing Gemino with another lender, Gemino provided a final extension through May 31, 2013 with a reduction in availability. The current outstanding amount on the Gemino line is approximately $4.0 million.

b.    <u>1998 and 1999 Bonds</u>

i.    In 1998 and 1999, KidsPeace Corporation, KidsPeace National Centers, Inc., and KidsPeace Children's Hospital, Inc. (the "Obligated Group")[3] issued revenue bonds (the "<u>1998 Bonds</u>" and the "<u>1999 Bonds</u>", and collectively, the "<u>Bonds</u>") through the Lehigh County General Purpose Authority in the original principal amount of $74,985,000. The amount of Bond debt currently outstanding is $51,310,000 plus accrued interest. UMB Bank, N.A, the Indenture Trustee for the Bonds (the "<u>Bond Trustee</u>") was granted a lien on, and security interest in, all of the Obligated Group's Gross Receipts (as defined in the Trust Indenture for the Bonds) to secure the Bonds. As a result of the default by the Obligated Group in the payment of debt service on the Bonds in 2012, the Debtors, with the exception of KP Georgia, entered into a Forbearance Agreement (the "<u>Forbearance Agreement</u>") dated January 11, 2013 with the Indenture Trustee, consented to by the

---

[3] Certain of the Debtors are not obligors under the 1998 Bonds and the 1999 Bonds (hereinafter the "<u>Non-Obligated Group</u>"). The Non-Obligated Group includes KidsPeace Mesabi Academy, Inc., KidsPeace National Centers of Georgia, Inc., KidsPeace National Centers of New England, Inc., KidsPeace National Centers of North America, Inc., Iron Range School, Inc., and KidsPeace National Centers of New York, Inc.

holders of the majority in principal amount of the Bonds (the "Majority Bondholders") whereby, among other things, KidsPeace Corporation executed a mortgage limited to $15,000,000 on the Debtors' Orchard Hills Campus in Orefield, PA in favor of the Bond Trustee, as mortgagee, as partial consideration for the Bond Trustee's agreement to forbear from the exercise of remedies available to it due to the defaults of the Obligated Group.

ii.     The net proceeds of the 1998 Bonds were used for the advance refunding of two former bond issues totaling $68,000,000, certain program capital expenditures, and funding of a debt service reserve fund.  The net proceeds of the 1999 Bonds were used to provide funds for the payment of the costs of refinancing certain indebtedness of the Obligated Group, the funding of a Debt Service Reserve Fund for the 1999 Bonds, and the payment of the costs and expenses of issuing the 1999 Bonds. The Obligated Group generated approximately 67%, 68% and 67% of the total consolidated revenue for the years ending on December 31, 2012, December 31, 2011, and December 31, 2010, respectively.

iii.    Interest on the 1998 Bonds and the 1999 Bonds is payable on May 1st and November 1st of each year.  The 1998 Bonds and the 1999 Bonds bear interest at rates ranging from 5.70% to 6.00% and mature on various dates through December 31, 2023.

iv.     In accordance with the provisions of the 1998 Bonds and the 1999 Bonds, the Debtors maintain investments held by the Bond Trustee that are reserved to meet, if necessary, future sinking fund requirements.  As of April 30, 2012, the debt service reserve was $6,786,122. The Debtors believe the Trustee may have distributed approximately $1,539,725 of the reserve to fund the May 1, 2012 distribution to the holders of the 1998 Bonds and the holders of the 1999 Bonds (hereinafter, collectively, the "Bondholders").  As of December 31, 2012, the debt service reserve was $3,706,968.

v.      Payments by the Debtors to the Trustee are due on May 15th and November 15th of each year.  The Debtors last made the payment on the Bonds when due on November 15, 2011.  The Debtors were unable to make the debt service reserve deposit payment due in January 2012.  The Debtors' failure to make this payment was an event of default under the parties' applicable loan documents, which entitled the Trustee to exercise certain remedies.  The Trustee issued a Notice of Default on May 1, 2012.

vi.     In accordance with the bond documents, if 75% or more of the Bondholders vote to change the trustee, such a change will be

effectuated.  In April 2012, the Bondholders changed the trustee from BNY Mellon in New York City to UMB Bank in St. Louis, Missouri ("UMB" or the "Bond Trustee"). In advance of the Bondholders' vote, the Debtors sent a letter in support of the change.

vii.    As discussed in greater detail below in paragraphs 56 to 61, the Debtors, excepting for KidsPeace National Centers of Georgia, Inc., entered into a Term Sheet, Forbearance Agreement and Plan Support Agreement on January 11, 2013 (the "Majority Bondholder Resolution") with the Bond Trustee and the Majority Bondholders.  As part of the Majority Bondholder Resolution, on January 14, 2013, the Debtors provided the Bond Trustee with a $15,000,000 mortgage encumbering the Orchard Hills Campus.

c.    Pension Underfunding

i.    The Debtors are sponsors of the Pension Plan, which is an ERISA-qualified defined benefit pension plan.

ii.    The Debtors adopted the KidsPeace Defined Benefit Retirement Plan (also the "Pension Plan") effective January 1, 1996, in order to provide a retirement income benefit to eligible employees. The Pension Plan was amended, or amended and completely restated, on several occasions between 1996 and 2008. The Debtors made annual contributions to the Pension Plan's trust fund. An independent actuarial consultant advised the Debtors each year of any contributions required to satisfy applicable legal requirements.

iii.    For the period beginning January 1, 2012, the Debtors have 2,373 participants in the Pension Plan (299 in pay status, 1,204 in terminated vested status, and 870 in active status). The average age of pay status participants is 67.4 years, with an average annual benefit of $10,536; the average age of terminated vested participants is 44.9, with an average annual benefit of $5,354; and the average age of active status participants is 44.5, with an average number of years of service of 8.5.

iv.    Benefits under the Pension Plan were "frozen" as of January 1, 2009.  Due to changes in federal law that significantly increased the Debtors' annual contributions to the Pension Plan, in amounts that the Debtors could no longer afford to pay, the Debtors' Board of Directors made the decision to discontinue the making of annual contributions and to pursue the plan's termination with the PBGC. KidsPeace did not make its annual contributions of approximately $3 million in the fiscal year ending on December 31, 2011.  Since

September 2011, the Debtors have made very limited contributions to the Pension Plan. The limited contributions were made at the request of the PBGC in concert with the sale of certain properties subject to the PBGC Liens and the execution of the PBGC Subordination and Intercreditor Agreement.

v. In the time period leading up to the Petition Date, the Debtors engaged in discussions with the PBGC regarding the Pension Plan's termination. In October 2011, the Debtors filed Form 600 with the PBGC for a distress termination of the Pension Plan. On March 21, 2013, the PBGC issued a letter granting the Debtors request for a distress termination, which the Debtors and the PBGC have executed. The distressed termination provides for the termination of the Pension Plan effective as March 31, 2012 and that the PBGC becomes the trustee.

vi. As a result of the missed contributions, on March 27, 2012, the PBGC filed a U.S. Treasury lien in the amount of $2,950,000, and again on December 12, 2012, the PBGC filed a U.S. Treasury lien in the amount of $4,175,029 representing the PBGC Liens referenced herein.

vi. The Debtors anticipate that the PBGC will assert (i) a secured claim in amount of $5,700,000 premised on the PBGC Liens as reduced based upon the retroactive termination effective date of March 31, 2012, which subtracts from the PBGC Liens any missed contributions that were subsequent to March 31, 2012; (ii) an unsecured claim for a termination fee of approximately $9,500,000; and (iii) an unsecured claim for an underfunding of the Pension Plan in the range of $100,000,000.

d. Georgia Bonds

i. The KidsPeace National Centers of Georgia, Inc. issued Certificates of Participation (hereinafter the "Certificates") in two separate series totaling $3,600,000 in December 2003. The net proceeds were used for program capital expenditures.

ii. A portion of these Certificates, totaling $3,240,000, constitutes Series A bonds, principal payment of which is guaranteed by the U.S. Department of Agriculture (the "USDA"). The interest rate for these Certificates resets every five years at the five-year Treasury Note Rate plus 1.80%. The next reset is on November 30, 2016. As of December 31, 2011, and December 31, 2010, the annual interest rate was 2.75% and 6.30%, respectively. Another portion of these Certificates, totaling $360,000, constitutes Series

B bonds, with no USDA guarantee.  The Certificates bear an interest rate of 9.5% per annum.  The Certificates mature on various dates through December 1, 2028.

iii. The loan agreement associated with the Certificates requires KidsPeace National Centers of Georgia, Inc. to generate sufficient revenues to provide an amount equal to 125% of the Net Debt Service requirements, as defined, after paying all operating expenses of the company.  As of December 31, 2011, and December 31, 2010, KidsPeace National Centers of Georgia, Inc. was not in compliance with this requirement.  This is not considered an event of default under the loan agreement.

iv. The Certificates are secured by a general pledge of gross revenue and certain real estate of KidsPeace National Centers of Georgia, Inc., pursuant to a loan and trust agreement.

e. <u>National Penn Bank</u>.  The Debtors currently have a mortgage payable to National Penn Bank at a fixed rate of interest of 6.7% due in monthly installments of principal and interest of $16,308 through May 2014, with a final payment of $1,088,428 in June 2014.  The mortgage payable is for the National Headquarters building in Schnecksville, PA.

f. <u>M & T Bank</u>.  Certain insurance programs of the Debtors require the Debtors to post letters of credit.  The Debtors have letters of credit (or "<u>LOCs</u>") with M & T Bank.  The Debtors are required to cash collateralize these letters of credit.  The secured letters of credit totaling $1,853,722 were outstanding on December 31, 2012, and remain in place to secure obligations under various insurance policies.  The letters of credit expire on varying dates between November of 2013 and April of 2014.  The cash collateral put in place for the letters of credit was $1,853,722, and the cash is in an account with M & T Bank.  The cash collateral is included in assets limited as to use-restricted cash in the consolidated balance sheets.

The LOCs include a $350,000 LOC for legacy liability policies with Lexington Insurance from 2002-2004, a $100,000 LOC for Philadelphia Insurance for prior and current liability policy years, and a $150,000 LOC for a Liberty Mutual 2007 Workers Compensation policy. In addition, the Debtors have a $1,200,000 LOC for the Commonwealth of Pennsylvania as required security for potential losses under their self-insured workers compensation program.

g.     Trade Debt. Although the Debtors were generally current with their trade creditors in the time period leading up to the Petition Date, the Debtors estimate that they owe trade creditors the approximate amount of $2 million.

h.     Employee, Foster Care and Independent Contractor Obligations. As more particularly set forth below, on the Petition Date, the Debtors have unpaid payroll obligations aggregating approximately $5.1 million and accrued benefits of approximately $1.78 million. In addition, the Debtors contract with approximately 740 foster parents, who are not employees and who are provided with bi-weekly stipends whenever foster children are placed in their homes. As of the Petition Date, the foster care obligations approximate $450,000. The Debtors further have contracts with approximately 33 independent contractors who are pediatric behavioral mental health specialist providing unique and direct care services to clients, evaluations of clients and management services. As of the Petition Date, the independent contractor obligations approximate $250,000. By

the First Day Pleadings, the Debtors are requesting authorization to pay these pre-Petition Date obligations.

## I.    **Restructuring Efforts**

36.    Up until 2008, the Debtors have operated a successful business and have been, for the most part, financially sound.  In more recent years, however, the Debtors, like many other organizations in their field, have faced increased challenges.  Reimbursement rates, particularly rates under the Medicaid program, the Debtors' largest payor, have been cut dramatically. Occupancy rates for residential programs have fallen significantly as eligibility criteria have been raised and placements from states outside Pennsylvania have declined due to the cost-saving measures of many state governments.

37.    Since early 2008, the Debtors have taken aggressive measures to continue their mission and have reduced their loan obligations (other than those under the 1998 Bonds and the 1999 Bonds) by approximately $4,500,000.  In addition, the Debtors have reduced their full time equivalent employee count from 2,300 to 1,670 employees.  At the same time, the Debtors' employees took significant pay reductions, ranging from .5% of annual salary for employees earning under $30,000.00 per year to 10% of annual salary for the members of executive management.

38.    On December 31, 2008, the Debtors froze the Pension Plan, essentially stopping all additional accruals of benefit for employed participants.

39.    During 2008, the Debtors began to experience a decline in their patient service revenue.  This decline was attributable to a number of factors, including: (a) the general economic recession in the region; (b) a decline in residential and foster care referrals; and (c) no increases in reimbursement rates, and for some programs, actual cuts in reimbursement rates.

31848-17                                    20

40.    In the Spring of 2009, after a technical default for fiscal year 2008 on their Bond Covenant (described below), and recognizing that it needed to continue aligning their expense structure to match their declining revenue, the Debtors engaged Parente Randolph ("Parente"), a healthcare consulting company specializing in expense control.  Parente made a series of recommendations to further reduce the Debtors' expenses, and those recommendations were implemented in the summer and fall of 2009.  The Debtors also hired Diamond HealthCare to assist with a new clinical model to enhance the recruitment of skilled professionals to their facilities.

41.    Throughout the 2010 calendar year, the Debtors engaged in a concerted and targeted effort to implement a clinical transformation process across their various programs. The purpose of this transformation was to improve the quality of services, expand the number of referrals and referral sources, and grow the revenue stream. Although not apparent in the financial figures for 2010, the clinical transformation began to have some positive fiscal impact in 2011.

42.    Throughout 2010 and 2011, the Debtors increased the number of licensed beds in the KidsPeace Children's Hospital, increasing average daily census from a historical average of 50 to an average of 73 during 2012.  At Mesabi Academy, average daily census had fallen to 46 in 2010.  The Debtors rebuilt it to an average of 72 during 2012.  For Pennsylvania Residential Programs, average daily census had fallen to 207 in 2010, and the Debtors have rebuilt it to an average daily census of 228 in 2012.

43.    Despite the above referenced measures, the Debtors continued to experience annual operating losses of nearly $6.5 million in 2010, in excess of $1.6 million in 2011 and

losses of approximately $4.5 million in 2012.  These losses were substantially attributed to the lack of rate increases and the growing pension obligations.

44.    In 2011, the Debtors engaged an investment bank in order to locate potential acquisition or merger partners.  The Debtors also initiated discussions with the PBGC regarding a distress termination of the Pension Plan, which the resolution thereof will have a significant impact on the economic future of the Debtors.

45.    In or about September 2011, the Debtors attempted to commence negotiations with the Bank of New York ("BNY"), as former trustee on the 1998 Bonds and the 1999 Bonds (the "Former Bond Trustee"), in an effort to obtain debt relief by way of either a debt reduction or an extended payment plan through an exchange offer.  At the commencement of the negotiation efforts, the Debtors were current on the bond obligations.

46.    Negotiations with the PBGC and the Former Bond Trustee were delayed.  While delayed, the Debtors were faced with cash constraints that precluded the Debtors from satisfying the upcoming obligations due to the Pension Plan and the Former Bond Trustee.  As previously stated, the Debtors missed the PBGC minimum funding requirements starting with the September 15, 2011 payment and the 1998 Bonds and 1999 Bonds payments to the Former Bond Trustee starting with the January 15, 2012 obligation.

47.    The Debtors engaged counsel, Norris McLaughlin & Marcus, PA, to assist them in the negotiations with the PBGC and the Bond Trustee and to represent them in the Chapter 11 Cases.  In addition, the Debtors engaged EisnerAmper LLP as their financial advisors.  The Debtors also engaged Morgan Keegan ("MK"), an investment banking firm.

48.     Since March of 2012, MK has been exploring possible affiliation or acquisition opportunities; however, no offer of an affiliation or acquisition has been presented to the Debtors.

**PBGC/Pension Plan Termination and Restructuring**

49.     As previously stated, the Debtors maintained a Pension Plan that covered their full-time employees that were plan participants prior to January 1, 2009.  Effective December 31, 2008, the Debtors adopted an amendment to freeze all subsequent accruals of benefits in their Pension Plan in an effort to better manage their financial responsibilities. Although the Debtors sought to satisfy their minimum funding requirements under the Pension Plan following this cessation of benefit accruals, the Debtors found that as a result of significant increases for the minimum funding requirements, as explained below, and the decrease in revenues that the Debtors would be unable to satisfy these on-going obligations. Thus, the Debtors determined that it is in the best interest of the organization to terminate the Pension Plan as soon as practical.

50.     The Pension Plan's operation and administration is overseen by the PBGC, a quasi-governmental entity that has the responsibility to guarantee the vested accrued benefits of a defined benefit plan participant in the event that the plan sponsor is unable to fund the arrangement to satisfy the financial liability associated with such retirement benefits.

51.     The current funding liabilities arising under the Pension Plan increased dramatically over the past several years due, in substantial part, to changes in the federal law governing the funding requirements associated with defined benefit pension plans. These changes effectively increased the total amount of funding required to be made to the trust maintained under the Pension Plan and accelerated payment of the annual amounts that would otherwise have not been required until future years.  By way of example, for each of the next 3

years, the Debtors funding requirements would have been $14,000,000, $13,500,000, and $12,700,000, respectively.   On a current funding basis, the shortfall between the value of the accrued benefits under the Pension Plan and the value of its current assets is estimated at $60 million; however, this funding liability could be substantially higher upon a termination calculation by the PBGC.

52.    On October 11, 2011, the Debtors filed with the PBGC a notice of their intent to terminate the Pension Plan.  On March 21, 2013, the PBGC issued a letter granting distressed termination, which the Debtors and the PBGC have executed.   The distressed termination provides for the termination of the Pension Plan effective as March 31, 2012 and that the PBGC becomes the trustee.   Although the Pension Plan has been terminated, the Debtors and its representatives have been and continue to be engaged in active negotiations with representatives of the PBGC to complete the plan termination process and to reach a final financial settlement.

53.    As part of the termination of the Pension Plan, the PBGC will assume a negotiated portion of the plan's total funding liability and assume financial responsibility for all future Pension Plan benefits payments, thereby permitting the Debtors to compromise the total potential financial liabilities that their organization would otherwise be required to satisfy if it continued to maintain the Pension Plan and, in turn, provide significant long-term cash flow relief.  The Debtors hope to negotiate a resolution of the PBGC liability with the PBGC during the Chapter 11 Cases.

**Restructuring of the 1998 Bonds and the 1999 Bonds and a Consensual Plan of Reorganization with the Bond Trustee and the Majority Bondholders**

54.    On or about April 10, 2012, the Bondholders voted to replace the Former Bond Trustee with the Bond Trustee.  The Bond Trustee retained the services of Schiff Hardin, LLP as its counsel, and Capstone Advisory Group as its financial advisors.   The Bond Trustee

immediately commenced its assessment of the Debtors' operations.   As a result of this assessment, the Bond Trustee and the Debtors commenced negotiations toward a Plan Support Agreement in August 2012.   The negotiations stalled as a result of the PBGC's inability to participate in the process.

55.     Subsequent to the increase in the PBGC Liens, the Bond Trustee and the Debtors agreed they need to form a consensual resolution as between themselves.

56.     On January 11, 2013, the Bond Trustee and the Debtors memorialized their resolution in a Term Sheet, Forbearance Agreement and Plan Support Agreement entered by and between the Debtors, excepting for Georgia, and the Bond Trustee, and the Majority Bondholders.

57.     As of the Petition Date, the outstanding principal balance on the 1998 Bonds and the 1999 Bonds aggregated $51,310,000 plus accrued unpaid interest.

58.     Pursuant to the Majority Bondholders Resolution, the 1998 Bonds and the 1999 Bonds will be cancelled and new bonds, Series A Bonds, Series B Bonds and Series C Bonds will be issued to the Bondholders.   The Series A Bonds will be in the principal amount of $18,035,000 and the Series B Bonds will be in the principal amount of $5,000,000, both of which will be secured by liens on all of the Debtors' assets, subject to pre-existing liens, including the PBGC Liens and the liens of the Debtors' working capital lender.   Both the Series A Bonds and the Series B Bonds will bear interest at 7.5% with a maturity date of 30 years from the effective date of the plan or reorganization.   Payments on the Series A Bonds will commence immediately.   The Series B Bonds will accrete for a period of 10 years to 14 years for which no payments will be due until the end of the accretion period.   From a cash flow perspective, the

Debtors will not be obligated to pay more than $1,500,000 of per annum debt service on the Series A Bonds and the Series B Bonds.

59.    The Bondholders will also be issued Series C Bonds in the principal amount of $15,000,000, which will bear no interest and will have an end day 30 years after the effective date of the plan of reorganization.  The Series C Bonds will receive payments in the future based on the Debtors on-going operations and more particularly, pursuant to a complex excess cash flow formula developed and agreed upon by the Debtors and the Bond Trustee.  The Series C Bonds will be unsecured and on the 30th anniversary any unpaid balance will be discharged and forgiven.

60.    Since the Majority Bondholders are desirous for the Debtors to recommence quarterly payments in accordance with the Majority Bondholders Resolution, the Majority Bondholders and the Debtors agreed that their proposed consensual restructuring shall remain in effect so long as the Debtors can confirm a plan of reorganization acceptable to the Bondholders on or before April 30, 2014.

61.    The Majority Bondholder Resolution is an agreed restructuring of the Bond Debt as between the Debtors, the Bond Trustee and the Majority Bondholders and remains subject to the Debtors' confirming a plan of reorganization as approved by the Court.  The trust agreements relating to the Bond Debt requires that any debt restructuring of the Bond Debt be approved by unanimous consent of the Bondholders.  As a result, the filing of the Chapter 11 Cases became necessary in order to implement the Majority Bondholder Resolution.

62.    The Debtors commenced the Chapter 11 Cases in order to (i) effectuate the Majority Bondholder Resolution in an expeditious manner, (ii) obtain replacement financing from HFG prior to the May 31, 2013 maturity date of the Gemino loan; and (iii) avoid any

possible increase of the PBGC Liens.  Also, the Debtors, the Bond Trustee and the Majority

Bondholders agreed to an approaching deadline to have the Court approve the Majority

Bondholder Resolution.

63.    As part of their restructuring initiatives, the Debtors have negotiated debtor in

possession ("DIP") financing with HFG, which is in an amount that will enable the Debtors to

finance the Chapter 11 process and to supplement its cash needs to maintain stable operations.

The Debtors discussed DIP financing with four different organizations.    Based on these

discussions, the Debtors determined that HFG offered the best financing opportunity on terms

most favorable to the Debtors.  This organization was selected based on experience, available

credit and cost to debtor.  Both the Debtors' executive management team and the Board of

Directors of KP Corp. have approved the recommendation of HFG as DIP lender.  As part of the

First Day Pleadings, the Debtors will file a motion seeking authorization to utilize HFG as the

lender for their DIP financing.  The Debtors anticipate the initial availability under the DIP

financing to approximate $13 million.  The financing will pay-off the existing Gemino obligation

and will be secured by a first priority lien on substantially all assets of the Debtors, subject to a

carve-out and certain valid non-avoidable liens existing as of the Petition Date.  It is anticipated

that pursuant to respective intercreditor agreements with HFG to be entered into in connection

with the approval of the DIP financing, the Bond Trustee and the PBGC will confirm their

agreement to subordinate their respective liens on receivables.

64.    Both the Bond Trustee and the PBGC were informed of the impending

commencement of the Chapter 11 Cases, were apprised of the various First Day Pleadings,

referenced below, and advised of the anticipated DIP financing.  Subsequent to the Petition Date,

the Debtors will continue with their negotiations with the PBGC.  The PBGC obligations must be restructured so that the Debtors can reasonably be expected to meet such obligations.

65.    Most importantly, notwithstanding the past and present financial restructuring initiatives, including the filing of the Chapter 11 Case, the Debtors have maintained exemplary patient care, which has not been effected.  With the Gemino financing and the anticipated DIP financing, the Debtors have maintained more than sufficient cash to satisfy day-to-day operations and expenses and anticipate that it will continue to do so throughout the Chapter 11 Cases. The remaining restructuring efforts of the Debtors relate primarily with their future debt structure associated with the 1998 Bonds, the 1999 Bonds and the PBGC.  This restructuring can only be accomplished through a chapter 11 filing.

## PART II: FIRST DAY PLEADINGS

66.    An important (and in many respects, critical) element of the success of these Cases will be the entry of orders granting the relief requested in each of the First Day Pleadings. Generally, the First Day Pleadings are designed to facilitate: (a) the continuation of the Debtors' existing cash management systems and other business operations without interruption, (b) preservation of customer and vendor relationships, (c) maintenance of employee morale and confidence, and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.   The factual background in support of each First Day Pleading is provided below.

A.    **Motion of Debtors and Debtors-in-Possession for an Order Directing Joint Administration of Cases Pursuant to Bankruptcy Rule 1015(b) (the "Joint Administration Motion")**

67.    In the Joint Administration Motion, the Debtors seek the joint administration of their chapter 11 cases for procedural purposes only.  The Debtors are affiliates as defined in

Section 101(2) of the Bankruptcy Code.  Joint administration of their cases will promote the economical, efficient, and convenient administration of the Debtors' estates.

68.    The Debtors' operations are closely integrated, and there will be numerous motions, applications, and other pleadings filed in these Cases that will affect all of the Debtors. Joint administration will allow for the efficient administration of the Debtors' nine chapter 11 cases.

69.    Joint administration of these Cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and for the Clerk to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.

70.    Allowing joint administration will significantly reduce the volume of pleadings that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, and minimize the number of unnecessary delays.  Moreover, the relief requested by this Motion will simplify supervision of the administrative aspects of these Cases by the Office of the United States Trustee.

71.    The proposed joint administration order also will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties-in-interest to: (a) use a single caption on the numerous documents that will be served and filed herein, and (b) file the papers in one case rather than in multiple cases.  Finally, joint administration will protect parties-in-interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in these cases.

72.    For the foregoing reasons, the Joint Administration Motion should be granted.

**B.      Motion of the Debtors for an Order Establishing Certain Notice, Case Management and Administrative Procedures (the "<u>Case Management Procedures Motion</u>")**

73.      By this Motion, the Debtors seek entry of an order establishing certain notice, case management, and administrative  procedures, including the following: (a) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)-(6) will be served upon a specified list of parties and those creditors who file with the Court a request that they receive such notices pursuant to Bankruptcy Rule 2002, (b) allowing electronic service of all documents (except complaints and summons), and (c) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court.   The Debtors further request that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to these Chapter 11 Cases to the extent that they do not conflict with the Case Management Procedures.

**C.      Motion of the Debtors for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "<u>Schedule Extension Motion</u>")**

74.      In the Schedule Extension Motion, the Debtors seek a 45-day extension of the deadline by which they must file their schedules of assets and liabilities and statements of financial affairs (hereinafter, collectively, the "<u>Schedules and Statements</u>").  The Debtors have many more than 1,000 creditors.  Pursuant to the Bankruptcy Code, the Debtors' deadline to file the Schedules and Statements is 14 days from the Petition Date.

75.      Given the size and complexity of the Debtors' business, a significant amount of information must be accumulated, reviewed, and analyzed in order to properly prepare the Schedules and Statements.  In addition, there are a number of critical issues facing the Debtors in the 14 days following the Petition Date.   These issues and others will require substantive attention by the Debtors' personnel and their professionals.   Thus, while the Debtors have

initiated the major task of assembling the data necessary for the Schedules and Statements, they

will not be able to complete this undertaking within 14 days from the Petition Date.

76.     In light of the circumstances outlined above, the Court should grant the relief

requested in the Schedule Extension Motion and authorize a 45-day extension of the deadline by

which the Debtors must file their Schedules and Statements.

> **D.** **Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to (I) Continue  Use of Existing Cash Management  System, (II) Maintain Existing Bank Accounts and Business Forms and (III) Maintain Existing Investment Practices; and (B) Granting Post-Petition Intercompany Claims Administrative Expense Priority (the "Cash Management Motion")**

77.     In the Cash Management Motion, the Debtors seek authority to maintain existing

bank accounts, to continue to use existing business forms, and to continue to use certain existing

cash  management  systems  (collectively,  the  "Cash Management System").    The Cash

Management System will provide an efficient means of moving funds through the Debtors'

corporate structure as needed.

78.     Prior to the Petition Date, the Debtors' Cash Management System operated in the

manner described in the Cash Management Motion.

79.     The Debtors seek authority to use the Cash Management System.  Given the size

and complexities of the Debtors' operations, as well as the need to preserve and enhance their

respective going concern values, a successful chapter 11 case simply cannot be accomplished if

there is substantial disruption in the Debtors' Cash Management System.  Moreover, the Cash

Management System includes the accounting controls necessary to enable the Debtors, their

creditors, and this Court to trace funds accurately through the Cash Management System.

80.     The Debtors have used the bank account structure that is the foundation of the

Cash Management System for a number of years as part of their ordinary and usual business

practices.  The Cash Management System is specifically tailored to the Debtors' needs in light of

its current financial situation and is necessary to deal efficiently with the specialized needs of the

Debtors.  If the Debtors are not permitted to continue to use their Cash Management System,

their operations will be severely, and perhaps irreparably, impaired.

81.     Accordingly, the Court should grant the relief requested in the Cash Management

Motion and authorize the Debtors' continued use of their existing Cash Management System.

**E.      Motion of Debtors for an Order (A) Authorizing the Debtors to Pay Certain Prepetition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Prepetition Employee Programs and Foster Care Stipends in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Employee Wage Motion")**

82.     In the Employee Wage Motion, the Debtors seek entry of an order: (a)

authorizing, but not directing, the Debtors to pay certain prepetition (i) wages, salaries, and other

compensation, (ii) reimbursable employee expenses, and (iii) employee medical and similar

benefits; and (b) authorizing and directing banks and other financial institutions to receive,

process, honor, and pay all checks presented for payment and electronic payment requests

relating to the foregoing.

83.     Currently, the Debtors employ approximately 1,951 employees, of which

approximately 1,485 are full-time employees and approximately 466 are part-time employees.

The Debtors employ approximately 531 salaried employees and 1416 hourly employees and

utilize the services of temporary workers, contract employees, and independent contractors

(hereinafter, collectively, the "Employees").  The Employees perform a variety of critical

functions for the Debtors' businesses, and the Employees' skills and their specialized knowledge

and understanding of the Debtors' infrastructure and operations, as well as their relationships

with patients, vendors, and other third parties, are essential to the Debtors' continuing operations

and their reorganization effort.  The continued and uninterrupted service of the Employees is critical to the successful reorganization of the Debtors.

84.    To avoid the personal hardship that the Employees will suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale, the Debtors seek authority, in their sole discretion, to pay and honor certain pre-petition claims for, among other items, wages, salaries, commission, and other compensation, other amounts withheld (e.g.,  garnishments, employee share of insurance premiums, tuition reimbursements, paid time off, medical benefits, insurance benefits, and workers' compensation benefits), and all other employee benefits that the Debtors historically paid or honored in the ordinary course of business to Employees and to pay all costs incident to the foregoing.  The Debtors also seek authority, in their discretion, to pay reimbursable business expenses of the Employees.

85.    In addition, the Debtors seek confirmation that they are permitted to pay any and all local, state, and federal withholding and payroll-related taxes relating to pre-petition periods.

86.    Further, the Debtors seek entry of an order authorizing all banks to receive, process, honor, and pay any and all checks drawn on the Debtors' payroll or general operating accounts or fund transfer requests with respect to payments authorized by this Motion, whether presented before or after the Petition Date, upon receipt, each bank and financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

     **a.**    **<u>Unpaid Compensation</u>**

87.    In the ordinary course of business, the Debtors: (a) transfer funds via direct deposit or issue payroll checks to their salaried and hourly Employees, and (b) pay temporary employees and independent contractors pursuant to invoices received and paid in the ordinary course of business.  Eighty-four percent of the Employees are paid by direct deposit transfers

from the Debtors' M & T operating account (hereinafter the "Payroll Account") with the other 16

percent of the Employees receiving paper payroll checks.

88.    The Debtors estimate that approximately $5,060,809 in wages, salaries, overtime

pay, incentive pay, vacation and sick leave taken and other compensation (excluding accrued

vacation and severance pay) remain unpaid, including any checks tendered to Employees on

account of such items that have not cleared the Payroll Account.  (Hereinafter, these items shall

be collectively referred to as "Unpaid Compensation.") Items of Unpaid Compensation were due

and owing on the Petition Date because, inter alia:

> a.    the chapter 11 petitions were filed during the Debtors' regular and
> customary salary and hourly wage payroll periods, and temporary and
> contract worker invoice periods;
>
> b.    some payroll checks issued to Employees from the Payroll Account prior
> to the Petition Date may not have been presented for payment or cleared
> the banking system and, accordingly, have not been honored and paid as
> of the Petition Date; and
>
> c.    Employees have not yet been paid all their salaries and wages for services
> performed prior to the Petition Date on behalf of the Debtors.

**b.    Paid Vacation**

89.    The Debtors offer various vacation benefits to the Employees.  Generally,

Employees are entitled to a certain number of days of paid vacation per calendar year depending

on their duration of employment.  Employees do not get paid for unused vacation days unless

they leave the employ of the Debtors and have accrued vacation.

90.     As of the Petition Date, most of the Debtors' Employees have accrued unused vacation days.   The total amount of such accrued vacation as of the Petition Date is approximately $293,000.  Employees also receive up to seven paid floating holidays each year. While Employees are not permitted to carry over unused floating holidays from year to year, they are paid their accrued unused floating holidays upon termination or resignation.

91.     The Debtors request: (a) authority to pay and honor payments made on account of the Unpaid Compensation, (b) authority to pay the Temporary Agency Fees, (c) that the Employees be authorized to use paid vacation days in the ordinary course of the Debtors' business, and (d) authority to cash-out paid vacation time and personal days of Employees in the event of their departure.

### c.      **Employee Benefits**

92.     The Debtors have established various plans and policies to provide their Employees with medical, dental, disability and life insurance, tuition reimbursement, and other similar benefits (hereinafter, collectively, the "Employee Benefits").  These Employee Benefits are described below.

93.     The Employees are entitled to health insurance for medical and prescription coverage through Highmark Blue Shield, Inc., vision coverage through Davis Vision, and dental coverage through United Concordia.  (Hereinafter, the medical, prescription, and dental coverage are collectively referred to as the "Health Benefits.")

94.     The Debtors have a self-insured medical expense reimbursement plan that covers all full-time employees.   Under this plan, the Debtors annually will pay up to $250,000 of covered medical expenses for each employee and then will have insurance to cover any expenses exceeding the $250,000 annual limit.  The cost of the plan amounted to $7,800,000, $8,078,627

and $8,933,268 for 2012, 2011 and 2010, respectively. This liability amounted to $915,000, $930,000 and $965,000 at December 31, 2012, December 31, 2011, and December 31, 2010, respectively.

95.    The Employees are also entitled to participate in a self-funded flexible spending account ("FSA") to pay for eligible out-of-pocket healthcare and dependant care costs. The Debtors deduct the Employee contributions to the FSA from the Employees' paychecks, and therefore, bear a small cost associated with the administration of the Employees' FSAs.

96.    The Debtors request that the Court authorize the Debtors to pay any premium amounts that are outstanding as of the Petition Date to providers of the Health Benefits in the ordinary course of business, to continue to maintain such programs for Employees in the ordinary course of business, and to continue to take actions necessary to administer the Employees' FSAs.

### d.    Employee Insurance Benefits

97.    Included among the Employee Benefits are certain insurance benefits provided to Employees (hereinafter, collectively, the "Employee Insurance Benefits").

98.    The Debtors provide the Employees with primary life insurance through Hartford. The Employees may also purchase supplemental life insurance, the premiums for which are paid entirely by the electing Employee though a payroll deduction. Short-term disability ("STD") benefits are provided for the Employees through Hartford. Long-term disability ("LTD") benefits are also provided for the Employees through Hartford. Employees may purchase supplemental LTD benefits at their own cost. Accidental death and dismemberment ("AD&D") benefits are provided for the Employees through the Hartford.

99.    The Debtors maintain a self-insurance arrangement for operations located in Pennsylvania that requires workers' compensation claims be funded directly by the Debtors, up to $500,000 per accident or $500,000 per employee.  The Debtors maintain insurance coverage for any expenses exceeding the self-insurance limits.  The cost of this arrangement amounted to $1,843,389, $1,080,974 and $1,301,036 at December 31, 2012, December 31, 2011, and December 31, 2010, respectively.  This liability amounted to $595,000, $365,000 and $546,000 at December 31, 2012, December 31, 2011, and December 31, 2010, respectively.  For operations located outside of Pennsylvania, KidsPeace maintains an insured arrangement for workers' compensation claims without limit.  The cost of this arrangement amounted to $439,427, $707,147 and $444,636 at December 31, 2012, December 31, 2011 and December 31, 2010, respectively.  This liability amounted to $16,394, $48,000 and $27,000 at December 31, 2012, December 31, 2011 and December 31, 2010, respectively.

100.    The Debtors pay an average of approximately $412,810 in premiums per year on account of the Employee Insurance Benefits described above, which is comprised of: (a) $54,310 in annual coverage costs with respect to life insurance, (b) $324,000 in annual costs with respect to LTD benefits, and (c) $34,500 for annual premium costs and fees with respect to workers' compensation insurance.  The Debtors seek authority, in the Debtors' discretion, to continue to pay such amounts, inclusive of amounts due as of the Petition Date.

101.    The Debtors request that the Court authorize, but not direct, the Debtors to continue, in the ordinary course of their business, to provide the Employee Insurance Benefits.

e.    **Other Employee Benefits**

102.    The Debtors provide the Employees with certain other benefits listed in the following paragraphs (hereinafter, collectively, the "Other Benefits").

103.    The Debtors have a 403(b) Tax Deferred Annuity Plan for their Employees that is administered by Diversified.  Pursuant to restrictions imposed by the Internal Revenue Service, employees under the age of 50 may contribute up to $17,500 per year and Employees over the age of 50 may contribute up to $23,000 per year.  The Debtors do not match Employee contributions.  The average yearly cost of administering the retirement plan is paid entirely by the Employees participating in the Retirement Plan through an annual deduction from their retirement accounts.

104.    The Debtors provide the Employees with an Employee Assistance Program ("the Employee Assistance Program") through ENI, Inc., which offers a maximum of three counseling sessions per year and other referral services for Employees with emotional, psychological or other mental health issues.

105.    Accordingly, the Debtors seek to be authorized, but not required, to pay the costs of the Other Benefits to the Employees in the ordinary course of business.

**f.    Reimbursable Expenses**

106.    In the ordinary course of their business, the Debtors reimburse certain Employees for costs and expenses associated with: (a) mileage, (b) tolls, (c) attendance at conferences, (d) publication expenses, (e) telephone expenses, (f) membership dues, (g) office supplies and (h) other business-related expenses paid by the Employees (collectively, the "Reimbursable Expenses").  As of the Petition Date, the Debtors estimate that they owe approximately $21,700 with respect to these costs.

107.    Accordingly, the Debtors seek to be authorized, but not required, to pay the Reimbursable Expenses to the Employees in the ordinary course of business.

**g.**     **Withheld Taxes and Employee Contributions**

108.     The Debtors deduct directly from their Employees' paychecks employee contributions for all insurance plans and flexible spending plans.  The Debtors also deduct: (a) payroll taxes and the Employees' portions of FICA and statutory unemployment taxes, and (b) legally-ordered deductions such as wage garnishments, child support, and tax levies (hereinafter, collectively, the "Employee Deductions").  The Debtors forward amounts equal to the Employee Deductions from their general operating account to appropriate third-party recipients.  Such Employee Deductions likely are not property of the Debtors' estates.  On average, the Debtors have deducted approximately $126,456 from the Employees' paychecks per each weekly payroll.

109.     By this Motion, the Debtors seek authority to forward the Employee Deductions to the appropriate parties.

**h.**     **Severance Benefits**

110.     As a matter of practice, the Debtors provide their Employees certain severance benefits (collectively, the "Severance Benefits") when Employees are terminated, except when a termination is for cause. These benefits are limited to severance pay equal to two weeks of regular pay and an additional month of health insurance coverage.

111.     In the Debtors' business judgment, any failure of the Debtors to honor Employees' Severance Benefits would be extremely detrimental to the morale, and hence stability, of the Debtor's workforce.

112.     The Debtors accordingly request that the Court authorize, but not direct, the Debtors to honor all Severance Benefits, in the ordinary course of business.

113.     The Employees are essential to the Debtors' operations.  Without the continued and uninterrupted service of the Employees, the Debtors would be unable to continue operating. The continued performance of the employees is necessary to sustain the Debtors' business

operations; thus, it is essential that the Debtors be authorized to make payments on account of pre-petition amounts due to such Employees. Accordingly, the "necessity of payment" doctrine authorizes the Debtors to pay the amounts they seek pursuant to the Employee Wage Motion.

114. The Employees will be exposed to significant financial and health-related risks if the Debtors are not permitted to satisfy unpaid Employee Obligations, particularly Unpaid Compensation and Health Benefits, as well as Reimbursable Expenses and Severance Benefits. Moreover, the Debtors believe that if they are unable to honor their Employee Obligations, Reimbursable Expenses and Severance Benefits, Employee morale and loyalty will be jeopardized at a time when the Employees' support is most critical.

115. Moreover, the Employee Deductions principally represent employee earnings that belong to the Employees or, in the case of garnishments, judicial authorities that have been designated for deduction from the Employees' paychecks. The failure to pay these benefits could result in hardship to certain Employees. If the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit these payments.

116. The Employees are essential assets to a value-maximizing reorganization. Deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and businesses, and, ultimately, the Debtors' ability to maximize value for creditors.

117. For all of the foregoing reasons, the Employee Wage Motion should be granted.

**F.      Motion of the Debtors for an Order (I) Authorizing the Debtors to Pay Prepetition Foster Care Stipends and (II) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "<u>Foster Care Stipend Motion</u>")**

118. The Debtors also provide twice per month stipends to approximately 740 foster parents whenever a foster child is placed in their care. Although the foster parents are not

employees of the Debtors' and the stipends do not constitute wages or salaries, the services provided by the foster parents are integral to the Debtors' operations and the quality of care provided to the Debtors' clients.  Disruption of payment of these stipends would be an extreme hardship on the foster parents and would place at risk the welfare of the Debtors' clients.

119.    To avoid the personal hardship that both the foster parents and the foster children will suffer if pre-petition foster care stipends are not paid when due or as expected, and to maintain morale and protect the welfare of the Debtors' clients, the Debtors seek authority, in their sole discretion, to pay and honor certain pre-petition claims  for foster care stipends.

**G.      Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

120.    In the Utilities Motion, the Debtors seek entry of an order: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of pre-petition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing a process by which Utility Providers may object to the Debtors' proposed adequate assurance procedures; and (e) setting a Final Hearing on the Debtors' proposed adequate assurance.

121.    In the ordinary course of business, the Debtors regularly incur utility expenses for water, electricity, gas, local telephone service, long-distance telephone service, cellular phone service, and Internet service.  The Debtors' aggregate average monthly cost for utility services is approximately $187,160.    The utility services are provided by approximately 78 Utility Providers.  A list of these Utility Providers is attached as Exhibit "A" to the Utilities Motion.

31848-17                                          41

122.    The Debtors have a long and established payment history with most or all of the Utility Providers, indicating generally consistent payment for utility service.  As of the Petition Date, however, the Debtors may have had: (a) pre-Petition Date accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for pre-Petition Date charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date, or (c) liabilities for pre-Petition Date utility services for which the Debtors had not yet been billed.

123.    It is critical that the Utility Services provided by all of the Utility Providers to the Debtors continue uninterrupted.

124.    The Debtors intend to pay all post-petition obligations to the Utility Providers in a timely manner.  Pursuant to the Debtor's proposed use of cash collateral, the Debtors anticipate that they will have available sufficient funds to pay all post-petition Utility Services in the ordinary course of business and to pay the proposed adequate assurance prepayments and deposits to the Utility Providers as set forth in the Utilities Motion.

125.    As adequate assurance of future payment to the Utility Providers, the Debtors propose to pay post-petition obligations owed to the Utility Providers in a timely manner. Assuming that the Court grants the Debtors' motion for debtor-in-possession financing with the authority to use cash collateral (hereinafter the "DIP Motion"), filed contemporaneously herewith, the Debtors will have sufficient cash on hand to pay such post-petition obligations.

126.    The Debtors also propose to provide a deposit equal to one month of utility service, calculated based on the historical average over the 12 months before the Petition Date to any Utility Provider who requests such a deposit in writing (hereinafter the "Adequate Assurance Deposit"), provided that such Utility Provider does not already hold a deposit equal to or greater

than the value of one month of utility services, and further provided that such Utility Provider is not currently paid in advance for its services. As a condition of requesting and accepting an Adequate Assurance Deposit, the requesting Utility Provider shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code and shall further be deemed to have waived any right to seek additional adequate assurance during the course of these Chapter 11 Cases.

127.    The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.

128.    For the foregoing reasons, the Utilities Motion should be granted.

**H. Motion of the Debtor for Entry of Interim and Final Orders, Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363 and 364, (I) Approving a Dip Loan Agreement, (II) Authorizing the Use of Cash Collateral, (III) Granting Superpriority Claims and Liens to Post-Petition Lender, (IV) Granting Prepetition Lien Holders Junior Liens as Adequate Protection, and (V) Scheduling a Final Hearing (the "DIP Motion")**

129.    Pursuant to the DIP Motion, the Debtors seek the entry of interim and final orders, among other things: (i) authorizing the Debtors to obtain post-petition financing on a senior secured and superpriority basis, in the form of a revolving credit facility in an aggregate principal amount at any time outstanding not to exceed $13,000,000 (the "Revolver") and a term line not to exceed $5,000,000 (the "Term Line"), the aggregate principal amount not to exceed $15,000,000, pursuant to the terms and conditions of a certain DIP Loan Agreement, by and between the Debtors, as borrowers, and HFG, as lender in the form annexed to the DIP Motion (the "DIP Loan Agreement"); (ii) authorizing the use of cash collateral; (iii) granting senior secured liens and superpriority claims to HFG, as post-petition lender and as adequate protection

for the use of cash collateral; (iv) providing adequate protection liens; (v) granting relief from the automatic stay to implement the terms of the Interim and Final Order; (vi) scheduling a final hearing to consider approval of the relief requested herein on a final basis.

130.    As set forth supra, creditors asserting liens against the assets include: a) Gemino; b) The Bond Trustee for Lehigh County General Purpose Authority (Authority) Revenue Bonds, Series of 1998 (the "1998 Bonds") and Series of 1999 (the "1999 Bonds"); c) Manufacturers and Traders Trust Co., Trustee for the 2003 Series A and Series B Georgia Bonds; and d) the PBGC. In addition, there are other creditors asserting liens including National Penn Bank  and the liens in financed or leased equipment, inventory, and/or machinery of each of Marlin Leasing Corporation, Hewlett-Packard Financial Services Company, Cisco Systems Capital Corporation, CIT Technology Financing Services, Inc., Univest Capital Inc., LEAF Funding, Inc. LEAF Capital Funding, LLC, De Lage Landen Financial Services, Inc., and IKON Financial Services, all of which are not being affected.

131.    The requested relief will result in a priming of the liens of a) the Bond Trustee; and b) the PBGC (the PBGC, collectively with the Bond Trustee, the "Affected Parties"), in each case solely in respect of the Debtors' receivables and the proceeds thereof; the Bond Trustee will consent to the proposed order; the PBGC consented pursuant to the PBGC Subordination and Intercreditor Agreement and it is anticipated that the PBGC will confirm its consent to the priming.

132.    The Debtors propose to provide the Affected Parties junior liens on the Debtors' real property as adequate protection of their interests, but only if and to the extent the Affected Parties' asserted lien is determined to be a valid, perfected, enforceable and unavoidable lien and only to the extent that there is a diminution in their collateral as more particularly provided in the

proposed Order approving the DIP financing.  The Debtors are stipulating, as part of the DIP and cash collateral order, that the liens of the Bond trustee are valid, perfected, enforceable and unavoidable.

133.    The Debtors intend to use the post-petition financing and cash collateral, among other things: (i) to immediately repay in full the outstanding obligations under the Borrower's revolving credit facility with Gemino Healthcare Finance (subject to the rights of parties in interest to investigate and challenge the validity of Gemino's claims and liens), and (ii) to fund operating expenses and other payments as set forth in the budget provided in connection therewith.  The Debtors do not have sufficient available sources of working capital or sufficient financing to carry on their business without the post-petition financing and use of cash collateral. As such the use of cash collateral is required to fund day-to-day operating expenses, including payments to employees, suppliers and vendors, to maintain patient care and generally to sustain the Debtors' business operations.  Without authority to obtain the post-petition financing and to use cash collateral, the Debtors will be unable to pay for services and expenses necessary to continue their business operations in an orderly manner and would be forced to immediately close and discontinue all business operations.

134.    The terms of the DIP financing are extremely favorable to the Debtors.  The financing offered by HFG contemplates a favorable interest rate (as described in further detail in the DIP Motion).  The aggregate availability is greater than that offered by any other lender and the overall financing cost is lower.  Each of the prospective lenders were requiring first priority liens on receivables and liens on all other assets and superpriority administrative expense claims. Prior to the Petition Date, the Debtors contacted CapitalSource Bank, Gemino, HFG and certain other institutions as potential sources for post-petition financing.  The Debtors received term

sheets from CapitalSource Bank, HFG and Gemino.  After reviewing and comparing the term sheets, the Debtors determined that the terms offered by HFG were the most favorable.  The Debtors' desire to enter into the DIP Loan Agreement reflects sound business judgment and is in the best interest of its estate.  The Court should grant the Motion in all respects.

135.    The access of the Debtors to sufficient working capital and liquidity through the use of post-petition financing and cash collateral is vital to the preservation and maintenance of the going concern values of the Debtors.  Therefore, approval of the DIP Motion, entry of the Interim Order, and authorization to use cash collateral pending a final hearing is in the best interests of the Debtors' estates and their creditors.

**I.    Motion of the Debtors, Pursuant to Sections 105(a) and 503 of the Bankruptcy Code and Bankruptcy Rules 3002 and 3003, for an Order Establishing Procedures for the Assertion of Section 503(b)(9) Claims Relating to Goods Received by the Debtors within Twenty Days Before the Petition Date (the "<u>503(b)(9) Motion</u>")**

136.    In the 503(b)(9) Motion, the Debtors seek entry of an order establishing procedures for the assertion of any claims entitled to priority under section 503(b)(9) of the Bankruptcy Code (hereinafter the "<u>503(b)(9) Claims</u>") relating to goods received by the Debtors within 20 days immediately prior to the Petition Date (hereinafter the "<u>Twenty-Day Period</u>").

137.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors purchased a variety of goods used in their operations.  Goods were received by the Debtors on a regular basis, and substantial amounts of goods were received within the Twenty-Day Period.  The Debtors estimate that within the Twenty-Day Period, the Debtors received goods from suppliers worth approximately $376,876.  Many of these suppliers have not yet been paid for these goods.

138.    To eliminate any uncertainty regarding the procedures to be used by claimants asserting 503(b)(9) Claims, to avoid piecemeal litigation, and to maintain uniformity and

consistency, the Debtors seek to establish procedures for the assertion and determination of 503(b)(9) Claims pursuant to the normal prepetition claims process in these cases and subject to the general bar date to be set by the Court in these cases for the filing of all prepetition claims (hereinafter the "503(b)(9) Procedures") as further defined in the 503(b)(9) Motion.

139.    The 503(b)(9) Procedures will provide clear guidance to all parties as to how 503(b)(9) Claims shall be filed in these cases and will streamline the process for consideration of such claims.  Requiring 503(b)(9) Claimants to participate in the normal claims adjudication process will provide the Debtors the opportunity to address the allowance of claims in an orderly and efficient way, will not impair in any way the substantive rights of any parties and will ensure that similarly situated creditors receive equal treatment.

140.    The Debtors further request that the 503(b)(9) Procedures be the sole and exclusive method for creditors to assert, seek determination of and obtain payment of the 503(b)(9) Claims.

141.    For the foregoing reasons, the 503(b)(9) Motion should be granted.

**J.      Motion of the Debtors for an Order (I) Authorizing the Debtors to Pay Independent Contractor Obligations and (II) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Independent Contractor Motion")**

142.    KP Corp., either directly or through its aforementioned subsidiaries, contracts with approximately 33 independent contractors ("Independent Contractors"), all of which are pediatric behavioral mental health specialist, who provide direct care services to clients, evaluations of clients or management services.  Independent Contractors are not employees of KP Corp.  They are paid from accounts payable upon receipt and verification of an invoice.

143.    KP Corp. provides the Independent Contractor payments to assist in meeting the treatment needs of clients and provide support to the management functions of the organization.

31848-17                                        47

Absent these payments to the Independent Contractors, the Debtors anticipate that the Independent Contractors will refuse to provide any further services to the Debtors and the Debtors' programs.  The Debtors respectfully submit that given the unique services provided by the Independent Contractors, it is almost impossible to find replacements for such Independent Contractors.  As such, payments to Independent Contractors are a vital and necessary part of the Debtors' operations.

144.    In order to avoid the irreparable harm to the Debtors continued operations, the Debtors seek authority, in their sole discretion, to pay and honor certain pre-petition claims for Independent Contractor obligations.

## PART III: CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the First Day Pleadings be granted.

/s/ William R. Isemann
William R. Isemann

Dated: May 21, 2013