# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>KidsPeace Corporation,¹ *et al*<br><br>Debtor. | Chapter 11<br><br>Case No. 13-14508<br>*Jointly Administered*<br>~~(Joint Administration Requested)~~ |
| In re:<br><br>KidsPeace Children's Hospital, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace Mesabi Academy, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace National Centers, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |
| In re:<br><br>KidsPeace National Centers of Georgia, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No.<br><br>(Joint Administration Requested) |

---

¹ The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: KidsPeace Corporation (3394); KidsPeace Children's Hospital, Inc. (4910); KidsPeace Mesabi Academy, Inc. (4179); KidsPeace National Centers, Inc. (4908); KidsPeace National Centers of Georgia, Inc. (7440); KidsPeace National Centers of New England, Inc. (1326); KidsPeace National Centers of North America, Inc. (4765); Iron Range School, Inc. (0561); and KidsPeace National Centers of New York, Inc. (1888). The Debtors' address is 5300 KidsPeace Drive, Orefield, Pennsylvania 18069.



| | |
|---|---|
| In re: | Chapter 11 |
| KidsPeace National Centers of New England, Inc., | Case No. |
| | (Joint Administration Requested) |
| Debtor. | |
| In re: | Chapter 11 |
| KidsPeace National Centers of North America, Inc., | Case No. |
| | (Joint Administration Requested) |
| Debtor. | |
| In re: | Chapter 11 |
| Iron Range School, Inc., | Case No. |
| | (Joint Administration Requested) |
| Debtor. | |
| In re: | Chapter 11 |
| KidsPeace National Centers of New York, Inc., | Case No. |
| | (Joint Administration Requested) |
| Debtor. | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTOR
TO USE PREPETITION COLLATERAL, (III) GRANTING ADEQUATE
PROTECTION, (IV) STIPULATING TO THE VALIDITY,
ENFORCEABILITY AND NON-AVOIDABILITY OF CERTAIN
PRE-PETITION LIENS AND (V) SCHEDULING FINAL HEARING**

Upon the motion, dated May 21, 2013 (the "Motion"), of KidsPeace Corporation

("KP Corp."), a Pennsylvania non-profit corporation, KidsPeace Mesabi Academy, Inc., a

Pennsylvania non-profit corporation, KidsPeace National Centers, Inc. ("KPNC"), a

34878-5                                    2

Pennsylvania non-profit corporation, KidsPeace National Centers of Georgia, Inc. ("KidsPeace

Georgia"), KidsPeace Children's Hospital, Inc. ("KPCH"), a Pennsylvania non-profit

corporation, KidsPeace National Centers of New England, Inc., a Pennsylvania non-profit

corporation, KidsPeace National Centers of North America, Inc., a New York non-profit

corporation, Iron Range School, Inc., a Pennsylvania non-profit corporation, and KidsPeace

National Centers of New York, Inc., a New York non-profit corporation, debtors and debtors-in-

possession (the "Debtors") in the above-captioned cases (the "Cases") for interim and final

orders under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e)

of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 2002,

4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

"Bankruptcy Rules") and the local bankruptcy rules for the Eastern District of Pennsylvania (the

"Local Bankruptcy Rules"), seeking, *inter alia*:

> (a)    authorization for the Debtors to obtain postpetition financing (collectively, the "Postpetition Financing" or the "DIP Facility") up to a maximum outstanding principal amount of $15.0 million in accordance with the Debtor-In-Possession Loan and Security Agreement among the Debtors, HFG Healthco-4 LLC ("HF-4"), as a lender, Healthcare Finance Group, LLC ("HFG") as a lender and administrative agent ("Agent") and such other lenders party thereto from time to time if any (collectively, with HFG and HF-4 as lenders, the "Lenders"; the Lenders together with the Agent, the "Lender Parties"), substantially in the form annexed to the Motion as Exhibit A (the "DIP Agreement"),[2] and the other Loan Documents;

> (b)    authorization for the Debtors to obtain from the Lenders on the Initial Funding Date and from time to time thereafter pending the Final Hearing (as defined below) revolving advances ("Revolving Loans") in amounts not to exceed a maximum outstanding principal amount of $8.0 million (the "Interim Amount") in accordance with the DIP Agreement, the other Loan Documents and this Interim Order;

> (c)    authorization for the Debtors to obtain from the Lenders upon entry of the Final Order, (i) revolving advances in amounts not to exceed a maximum outstanding

---

[2]    Capitalized terms not otherwise defined in this Interim Order shall have the definitions ascribed to them in the DIP Agreement.

principal amount of $13.0 million and (ii) multi-draw term loans ("Term Loans") in an amount not to exceed $5.0 million, in each case in accordance with the DIP Agreement, the Loan Documents and the Final Order; *provided* that the aggregate principal amount (excluding interest, fees and other charges) of the DIP Facility shall not exceed $15.0 million (the "Aggregate Committed Amount"); *provided, further* that the Term Loans shall only be available for borrowing to the extent HFG is granted a first priority priming lien on the Designated Real Property, relief which is not requested by the Motion or contemplated by this Interim Order or the Final Order (as defined below);

(d)    authorization for the Debtors to execute and deliver the DIP Agreement and the Loan Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(e)    authorization for the Debtors to use proceeds of the DIP Facility to repay on the Initial Funding Date the outstanding amounts (the "Gemino Obligations") due from the Debtors to Gemino Healthcare Finance, LLC ("Gemino") under the Debtors' credit agreement dated September 14, 2009 with Gemino (as amended, restated, supplemented or modified from time to time, the "Gemino Credit Agreement");

(f)    authorization for the Debtors to grant to the Lender Parties assurances for the full and timely payment of the Lender Debt by granting to the Agent (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "Superpriority Administrative Expense Claim") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carveout (as defined below); and (ii) pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the Collateral (as defined below), subject only to the Carveout and the Valid Non-Primed Pre-Petition Senior Liens (as defined below);

(g)    authorization for the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral (as defined below) and approving the grant of adequate protection to UMB Bank, National Association, St. Louis, Missouri, as trustee (the "Bond Trustee") for Lehigh County General Purpose Authority Revenue Bond, Series of 1998 KidsPeace Corporation (the "1998 Bonds") and Series of 1999 KidsPeace Corpration (the "1999 Bonds") and the Pension Benefit Guaranty Corporation (the "PBGC" and together with the Bond Trustee, the "Affected Parties") as provided herein;

(h)    scheduling, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the Interim Order, among other things, authorizing the Debtors, on an interim basis, to borrow the Interim Amount under this Interim Order, the DIP Agreement and the Loan Documents; and

(i)    scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on the Motion to consider entry of a final order (the "Final Order") authorizing

and approving, on a final basis, the Postpetition Financing, and establishing notice procedures in respect of the Final Hearing.

The Debtors having requested in the Motion that pending the Final Hearing on the Motion, a hearing be scheduled on an expedited basis to consider entry of this Interim Order; and notice of such expedited hearing having been given to (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) the Office of the United States Attorney for the Eastern District of Pennsylvania; (c) the Office of the Attorney General for the Commonwealth of Pennsylvania; (d) the Commonwealth of Pennsylvania Department of Labor and Industry; (e) the Commonwealth of Pennsylvania Department of Revenue; (f) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed by the Debtors pursuant to Bankruptcy Rule 1007(d); (g) counsel to the Bond Trustee; (h) the Internal Revenue Service, Insolvency Section and Department of Treasury; (i) Manufacturers and Traders Trust Co., Trustee for the 2003 Series A and Series B Georgia Bonds (the "Georgia Bond Trustee"); (j) U.S. Department of Agriculture; (k) National Penn Bank; (l) Gemino Healthcare Finance; (m) M & T Bank; (n) the PBGC; (o) counsel for the Lenders and the Administrative Agent; (p) the United States Department of Health and Human Services; (q) all applicable State Medicaid agencies, health agencies and taxing authorities; and (r) Citizens Bank of Pennsylvania ("Citizens Bank"); and it appearing that under all of the attendant circumstances and after considering the Debtors' immediate need for interim financing, no other or further notice need be given; and the Lender Parties having agreed to provide the Postpetition Financing in accordance with the DIP Agreement, the Loan Documents and this Interim Order.

NOW, THEREFORE, upon the Motion and the record of the Interim Hearing held before me on May 23, 2013; and after due deliberation and good and sufficient cause appearing therefor, the Court hereby makes the following findings of fact and conclusions of law:

34878-5                                     5

Based upon the record presented to the Court, it appears that:

A.    Filing.  On May 21, 2013 (the "Filing Date"), each of the Debtors filed a voluntary petition for reorganization in this Court under chapter 11 of the Bankruptcy Code. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    Gemino Obligations.  Without prejudice to the rights of any other party, the Gemino Obligations are in the approximate amount of $5 million and are secured by the Debtors' receivables which as of the Filing Date appear to be of a value substantially in excess of the Gemino Obligations.

C.    Need for Postpetition Financing and Use of Prepetition Collateral (including Cash Collateral).  The Debtors have an immediate need to obtain the Postpetition Financing and to use their existing assets which are subject to the liens of the Affected Parties; and other secured creditors' liens and security interests (the "Prepetition Collateral") including proceeds of the Prepetition Collateral and all cash on deposit as of the Filing Date within the meaning of Section 363(c) of the Bankruptcy Code (the "Cash Collateral").  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Postpetition Financing and the Debtors' use of the Prepetition Collateral (including Cash Collateral).  The ability of the Debtors to pay employees, maintain business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operations is essential to the Debtors' continued viability and to the well-being of the Debtors' patients and other children, adolescents and young adults dependent on the Debtors' programs and services.  Without the Postpetition Financing and the Debtors' use of the Prepetition Collateral (including Cash Collateral), the continued orderly operation of the

Debtors' critical programs and services, including foster care, patient care and treatment programs, would not be possible, and serious and irreparable harm to the Debtors and their estates as well as their patients and children, adolescents and young adults dependent on the Debtors' programs and services would result. The purpose of the Postpetition Financing and the Debtors' use of the Prepetition Collateral (including Cash Collateral) will thus be to preserve, maintain and enhance the going concern value of the Debtors, maintain critical programs and services, and protect patients and other children, adolescents and young adults dependent on the Debtors' programs and services.

D.    No Credit Available on More Favorable Terms.    Given the Debtors' financial condition, financing arrangements, and capital structure, as well as the uncertain timing of collections of receivables, the Debtors do not have sufficient Cash Collateral to fund their businesses and are otherwise unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. Financing on a postpetition basis is not otherwise available without the Debtors' granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code. The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable in the aggregate than those provided by the Postpetition Financing.

E.    Need to Grant Superpriority Administrative Expense Claim and Priming Liens.    The Debtors are unable to obtain an adequate unsecured credit facility allowable under section 503(b)(1) of the Bankruptcy Code and must grant to the Lender Parties a Superpriority

Administrative Expense Claim as contemplated by section 364(c)(1) of the Bankruptcy Code and liens as contemplated by section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code. The Lender Parties have conditioned all loans and advances to be made under the DIP Agreement upon the grant to the Lender Parties of: (a) a Superpriority Administrative Expense Claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of any kind or nature whatsoever specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carveout; and (b) in accordance with section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on and security interests in the Collateral subject only to the Carveout and the Valid Non-Primed Pre-Petition Senior Liens.

F.    Repayment of Gemino Debt. The Postpetition Financing contemplates the repayment of the Gemino Obligations so that the Lender Parties can be granted a senior lien on the Debtors' prepetition and postpetition receivables and so all such receivables (other than the receivables of KidsPeace Georgia (the "Georgia Receivables") are included in the DIP Facility borrowing base. Failure to pay the Gemino Obligations would result in a potentially costly and lengthy priming fight with Gemino or insufficient availability under the DIP Facility. This Interim Order preserves the rights of parties in interest to investigate and, if appropriate, challenge the validity, enforceability, perfection and priority of the Gemino Obligations and the liens securing the Gemino Obligations, such that there will not be prejudice to any party in interest as a consequence of the Debtors' immediate repayment of the Gemino Obligations. Based on the foregoing, the proposed immediate repayment of the Gemino Obligations is in the best interests of the Debtors and their estates and does not adversely affect any party in interest.

G.    DIP Facility. Pursuant to the DIP Facility, the Lender Parties have agreed to provide (a) Revolving Loans to the Debtors in amounts not to exceed the maximum

outstanding principal amount at any one time of (i) following entry of the Interim Order and prior to entry of the Final Order, $8.0 million, and (ii) upon entry of the Final Order, $13.0 million, in each case in accordance with the DIP Agreement (including the Borrowing Base), the Loan Documents, the Budget (as defined below) and the Final Order; and (b) multiple draw Term Loans to the Debtors in an amount not to exceed the principal amount outstanding at any time following entry of the Final Order of $5.0 million, in accordance with the DIP Agreement, the Loan Documents, the Budget and the Final Order; *provided* that the Term Loan shall only be made available for borrowing to the extent the Lender Parties are granted a first priority priming lien on the Designated Real Property and the proceeds thereof, relief which is not contemplated by this Interim Order or the Final Order. In no event shall the total principal amount of the DIP Facility exceed the Aggregate Committed Amount of $15.0 million. The Lender Parties shall have the discretion to establish reserves in the Borrowing Base and against the Aggregate Committed Amount in accordance with the DIP Agreement.

H.      Priming of Affected Parties' Liens; Adequate Protection. The PBGC and the Bond Trustee have consented to the priming of their liens, as provided in this Interim Order, subject to the grant of adequate protection in the manner set forth herein, the entry by the Lender Parties and the Bond Trustee into an intercreditor agreement governing the respective rights of the Lender Parties and the Bond Trustee in the Collateral and written acknowledgement by the PBGC that the Lender Parties constitute a "Replacement Lender" as defined in the PBGC Intercreditor Agreement. For avoidance of doubt, the 10% limitation set forth in the trust agreement governing the 1998 Bonds and the 1999 Bonds on the grant of senior liens in Gross Receipts of the Obligated Group (each as defined in the Bond Trust Agreement) shall not limit,

and shall otherwise be of no force and effect in respect of, the DIP Facility and the liens securing the DIP Facility.

       I.       <u>Valid Non-Primed Pre-Petition Senior Liens</u>.  The liens, if any, of the following parties, but only to the extent such liens were, as of the Filing Date, valid, enforceable and not subject to avoidance and only to the extent the claims in respect of such liens remain unpaid, shall not be primed by the liens securing the DIP Facility: (i) National Penn Bank's mortgage against the National Headquarters building in Schnecksville, Pennsylvania; (ii) M&T Bank's security interest in Cash Collateral in an account with M&T Bank totaling approximately $1.83 million securing approximately $1.9 million of letters of credit issued by M&T Bank on behalf of the Debtors; (iii) the Georgia Bond Trustee's security interest in the gross revenue and certain real estate owned by KidsPeace Georgia; (iv) the liens in financed or leased equipment, inventory, and/or machinery of each of Marlin Leasing Corporation, Hewlett-Packard Financial Services Company, Cisco Systems Capital Corporation, CIT Technology Financing Services, Inc., Univest Capital Inc., LEAF Funding, Inc. LEAF Capital Funding, LLC, De Lage Landen Financial Services, Inc., and IKON Financial Services, (v) the Bond Trustee's mortgage against the Orchard Hills Campus real property; and (vi) the PBGC's liens in the Collateral (other than the Debtors' receivables and the proceeds thereof) (collectively, the "<u>Valid Non-Primed Pre-Petition Senior Liens</u>"); *provided* however that so long as the liens specified in clauses (v) and (vi) constitute Valid Non-Primed Pre-Petition Senior Liens in respect of the Designated Real Property, the Terms Loans shall not be available for borrowing by the Debtors.

       J.       <u>Business Judgment and Good Faith</u>.  The terms of the Postpetition Financing including the interest rates and fees applicable thereto, are at least as favorable to the Debtors as those available from alternative sources.  The terms of the Postpetition Financing

have been negotiated in good faith and at arm's length among the Debtors, the Lender Parties

and the Bond Trustee, reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties, and are fair and reasonable under the circumstances, and are enforceable in

accordance with applicable law. The credit extended to the Debtors by the Lender Parties under

the Postpetition Financing and this Interim Order shall be deemed to have been extended in

"good faith" as that term is used in section 364(e) of the Bankruptcy Code, and in express

reliance upon the protections set forth therein, and shall be entitled to the full protection of

section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision

hereof is vacated, reversed or modified, on appeal or otherwise.

K.    Need for Immediate Approval.  The Debtors have requested immediate

entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the

Local Bankruptcy Rules.  Absent granting the relief sought by this Interim Order, the Debtors'

estates will be immediately and irreparably harmed.  The Debtors have no alternative source of

financing to meet their immediate and projected obligations, including payroll and other

operating expenses, and consequently, it is essential that the Court approve the interim financing

contemplated hereby on an immediate basis.  Consummation of the Postpetition Financing and

authorization of the use of the Prepetition Collateral (including Cash Collateral) in accordance

with the terms of this Interim Order are therefore in the best interests of the Debtors' estates, and

are consistent with the Debtors' exercise of their fiduciary duties.

L.    Jurisdiction and Venue.  This Court has jurisdiction over the Cases, the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

This Interim Order is entered in a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A),

(D), (G), (K) and (M).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014.

M.   Notice.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice thereof, complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

N.   Record.  The record adequately demonstrates the need for the Court to have conducted the Interim Hearing on the notice provided because of the potential for immediate and irreparable harm to the Debtors, their assets, businesses and estates.  Based on the record, the Court finds, pursuant to sections 105, 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), that notice of the Interim Hearing was adequate under all the circumstances set forth herein.

Based upon the foregoing, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

## Approval and Authorization.

1.   Motion Granted.  The Motion is granted as to the Debtors' request for interim relief with respect to the Postpetition Financing to the extent provided herein.  Any objections to the interim relief sought in the Motion with respect to the entry of this Interim Order that have not been previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.   Approval of Documents.  The Postpetition Financing, the DIP Agreement and the Loan Documents are hereby approved subject to the terms of this Interim Order

including the Interim Amount.  The failure to reference or discuss any particular provision of the DIP Agreement or any other Loan Document shall not affect the validity or enforceability of any such provision.

      3.    <u>Authorization to Execute and Deliver Documents</u>.  The Debtors are expressly authorized, empowered and directed to do and perform all acts to make, execute, deliver and implement the DIP Agreement and any other Loan Document of any kind required to be executed and delivered in connection therewith.  Upon execution and delivery of the DIP Agreement and the Loan Documents, as the case may be, the DIP Agreement and the Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Agreement and the Loan Documents.  No obligation, payment, transfer or grant of security under the DIP Agreement, the Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.  The Debtors are authorized and directed to pay all principal, interest, fees, costs and other expenses that may be required or necessary for the Debtors to perform all of their obligations under this Interim Order, the DIP Agreement and the Loan Documents without any further order or approval of the Court.

      4.    <u>Authorization to Borrow; the Budget</u>.  Good and sufficient cause has been shown for the entry of this Interim Order.  The Debtors are authorized and empowered to borrow funds pursuant to the DIP Agreement up to the Interim Amount pending the Final Hearing for

the purposes permitted under the DIP Agreement and this Interim Order, all in accordance with the budget attached to this Interim Order as Exhibit A (the "Budget").

5.    Amendments.  The Lender Parties and the Debtors may amend, modify, supplement or waive any provision of the DIP Agreement or the Loan Documents if such amendment, modification, supplement or waiver is not material (in the good faith judgment of the Lender Parties and the Debtor), without any need to apply to, or receive further approval from, the Court.  Any material amendment, modification, supplement or waiver shall be in writing, signed by the parties and approved by the Court on appropriate notice.

**Gemino Obligations.**

6.    Repayment of Liquidated Gemino Obligations.  Subject to the rights of the Debtors and their estates to challenge the obligations of the Debtors (collectively, the "Gemino Obligations") arising under or related to the Credit Agreement dated September 14, 2009 (as at any time amended, the "Gemino Credit Agreement") between the Debtors and Gemino and the liens securing the Gemino Obligations as provided in paragraph 8(a) hereof, the Debtors are authorized and directed on the Initial Funding Date to pay to Gemino the amount of the liquidated, non-contingent Gemino Obligations and an estimate of legal expenses to be incurred through the Final Hearing as set forth in a written statement provided by Gemino to the Debtors. Upon Gemino's receipt of such payment, the Gemino Credit Agreement shall be deemed to have terminated, provided, however, that notwithstanding Gemino's receipt of such payment, Gemino shall retain its claims against the Debtors for indemnification and reimbursement as and to the extent provided in the Loan Documents (as defined in the Gemino Credit Agreement) (collectively, the "Remaining Gemino Claims").  For purposes of determining Gemino's rights and claims, if any, under sections 506(b) or 507(b) of the Bankruptcy Code, Gemino's secured status shall be determined as of the Petition Date.

7.    Subordinated Replacement Liens in Favor of Gemino.  As adequate

protection for the termination of its pre-petition liens, Gemino is hereby granted subordinated

replacement liens (the "Gemino Replacement Liens") on all Collateral to secure the Remaining

Gemino Claims to the extent that Gemino's liens and claims were valid, enforceable and non-

avoidable as of the Petition Date.  The Gemino Replacement Liens shall be automatically

perfected by entry of this Order, shall be junior and subordinate in all respects to (a) all other

liens and security interests granted in this Order including the liens granted to HFG and the

Adequate Protection Liens (as defined below), (b) the Valid Non-Primed Pre-Petition Liens, (c)

the Carveout and (d) all existing liens and security interests in the Collateral to the extent valid,

enforceable and non-avoidable as of the Petition Date including the liens of the PBGC and the

Bond Trustee in the receivables, and shall be released upon the Court's approval of payment of

Gemino in full and a Gemino Release (as defined below) or as provided in further order of the

Court.  Gemino, Agent and the Debtors are hereby authorized and directed to cooperate with

each other and to execute and deliver such documents as may be reasonably requested by the

others in order to transition Gemino's rights in any Collateral including any lockboxes or Special

Collection Accounts (as defined below) to the Lender Parties subject to Gemino's receipt of the

payment due to it on the Initial Funding Date.

8.    Preservation of Challenge Rights; Notice of Potential Release of Gemino.

(a)    Notwithstanding the Debtors' payment of the Gemino Obligations, the

Debtors and each other party in interest who has or obtains standing to do so, including any

official committee appointed in the Cases (collectively, the "Committee(s)"), shall have the right

to challenge the validity, enforceability, perfection and priority of the Gemino Obligations and

the liens securing the Gemino Obligations, provided that such challenge is made in a contested

matter or adversary proceeding filed prior to the Gemino Challenge Deadline (as defined below). In the event of such a challenge, the Court reserves jurisdiction to order appropriate relief against Gemino, including disgorgement of the Debtors' payment of the Gemino Obligations. As used herein, the term "Gemino Challenge Deadline" shall mean the date of the Final Hearing or such later date as the Court may establish at or prior to the Final Hearing.

(b)     Notice is hereby provided that in connection with final and indefeasible payment of Gemino and the release of all liens securing the Remaining Gemino Claims, to the extent agreed by the Debtors and Gemino, at the Final Hearing, the Court may consider a full and complete release of claims by the Debtors and their bankruptcy estates in favor of Gemino (the "Gemino Release"), the Debtors' immediate payment of Gemino's unpaid post-petition reasonable legal fees and expenses under section 506(b) of the Bankruptcy Code and related relief.

### Use of Prepetition Collateral (Including Cash Collateral).

9.      Use of Prepetition Collateral (Including Cash Collateral). The Debtors are authorized to use the Prepetition Collateral (including the Cash Collateral subject to the liens and security interests of the Affected Parties and the Georgia Bond Trustee) during the period from the Filing Date until the occurrence and continuation of an Event of Default (as defined in the DIP Agreement) for the same purposes as set forth in and in accordance with this Interim Order, the DIP Agreement and the Budget, *provided* that the Affected Parties are granted adequate protection as set forth below.

### Payment of Lender Debt.

10.     Payment of Principal, Interest, Fees, Etc. The Debtors shall pay to the Lender Parties principal and interest as provided in this Interim Order, the DIP Agreement and the Loan Documents in accordance with the procedures herein and therein set forth (and the

Lender Parties shall be permitted to charge such amounts to the DIP Facility).  In consideration of the financial and other accommodations to be made by the Lender Parties under this Interim Order, the DIP Agreement and the Loan Documents, the Debtors are hereby authorized and directed, without further order of the Court, to pay to the Lender Parties all fees and charges as set forth herein and in the DIP Agreement and the Loan Documents and to reimburse the Lender Parties for all reasonable out of pocket expenses and professional fees and related disbursements incurred by the Lender Parties in connection with the preparation of the DIP Agreement and the Loan Documents or in connection with or related to the Debtors or the Cases; *provided* that the Lender Parties shall provide a copy of any invoices (redacted with respect to privileged matters) for their professional fees and expenses to counsel for the Debtors, counsel for the Bond Trustee, counsel for the PBGC, counsel for the Committee(s), once appointed, and the Office of the United States Trustee, and in absence of an objection filed with this Court within 10 days after receipt of such invoices, the Debtors are authorized and directed to pay the amount of such invoices.

### Superpriority Administrative Claim; Collateral.

11.    Superpriority Administrative Expense Claim; Carveout; Waiver under Section 506(c). All of the Lender Debt shall have the status of an allowed Superpriority Administrative Expense Claim in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, whether heretofore or hereafter incurred, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims

may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, subject only to the Carveout. Except for the Carveout, (i) no claim or expense having a priority senior or *pari passu* to the priority granted to the Lender Parties in this Interim Order shall be granted or permitted in the Cases, or any superseding chapter 7 case, and (ii) no other costs or expenses of administration of any kind, nature or description whatsoever shall be imposed against the Collateral under sections 105, 506(c), or 552 of the Bankruptcy Code or otherwise, in each case, while any portion of the Lender Debt remains outstanding.

For purposes hereof, the "Carveout" means amounts payable after the Lender Parties have ceased making loans or advances under the Postpetition Financing pursuant to the terms hereof and the DIP Agreement: (i) pursuant to 28 U.S.C. § 1930(a)(6); (ii) on account of unpaid Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000; and (iii) on account of unpaid Bankruptcy Court-allowed professional fees and expenses (whether incurred prior to or subsequent to an Event of Default) of (w) so long as the Plan Support Agreement has not been terminated, the Bond Trustee, including the allowed fees and expenses of its counsel and advisors, if no official bondholder committee is formed, (x) attorneys, accountants, financial advisors and consultants retained by the Debtor, the Committee(s), and/or the patient care ombudsman, (y) the patient care ombudsman, and (z) the out-of-pocket expenses of Committee members pursuant to sections 327, 328, 333 and 1103 of the Bankruptcy Code (clauses (w) through (z) collectively, "Professional Expenses"); *provided* that the aggregate amount of Professional Expenses entitled to priority over the Superpriority Administrative Expense Claim

and the liens and security interests granted pursuant hereto, the DIP Agreement and/or the Loan Documents ("Priority Professional Expenses"), shall not exceed in the aggregate (i) prior to entry of the Final Order, $575,000 and (ii) following entry of the Final Order, $1,275,000 (collectively, the "Priority Professional Expense Cap"); *provided, further* that, any retainers or any payments to such professionals under sections 330 and 331 of the Bankruptcy Code in respect of fees and expenses incurred that were actually paid to such professionals prior to the occurrence of a Termination Event (as defined below), shall not reduce the Priority Professional Expense Cap; and *provided, further* that, notwithstanding the foregoing, the limited priority granted hereunder or under the DIP Agreement and/or the Loan Documents for Priority Professional Expenses shall not waive any right of the Lender Parties or any other party in interest to object to fees and expenses constituting such Priority Professional Expenses. Notwithstanding the foregoing, no loans or advances made under the Postpetition Financing nor any portion of the Carveout may be used to prosecute actions, claims, demands or causes of action against the Lender Parties or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the liens and security interests granted to the Lender Parties hereunder, or the Lender Debt.

12.    Payment of Administrative Expenses. Unless an Event of Default shall have occurred (or would result from such payment), subject to the Budget, the Debtors shall be permitted to pay, as the same may become due or authorized and payable, administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of their businesses (other than as prohibited under paragraph 11 hereof). After the occurrence of a Termination Event that is continuing, trustee fees payable under section 726 of the Bankruptcy Code, and compensation and reimbursement of expenses to professionals

allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, shall be limited by the amount and terms of the Carveout and the restrictions contained in paragraph 11 hereof.

13. <u>Collateral Security</u>. As security for the full and timely payment of the Lender Debt, the Agent, for the benefit of the Lenders, is hereby granted pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, all of the Collateral, subject only to the Carveout, the Valid Non-Primed Pre-Petition Senior Liens and the Bond Trustee's Priming Adequate Protection Lien (as defined below). The term "Collateral" shall have the definition ascribed thereto in the DIP Agreement and includes all of the Debtors' assets including, without limitation, whether now existing or owned or hereafter arising or acquired, all receivables, all general intangibles and payment intangibles, contract rights, deposits and deposit accounts, goods, inventory, machinery and equipment, goodwill and investment property, membership rights, privileges and interests in any person, real property and leasehold interests, and all cash and non-cash proceeds of the foregoing. Notwithstanding anything to the contrary contained herein or in the DIP Agreement, pending entry of the Final Order, the term "Collateral" shall exclude any and all causes of action of the Debtor and its estate under sections 544, 545, 547, 548, 549, 550 and 724 of the Bankruptcy Code and any proceeds thereof ("Avoidance Actions"). Following entry of the Final Order, the term "Collateral" shall include the Avoidance Actions. For avoidance of doubt, there shall not be any Valid Non-Primed Pre-Petition Senior Liens or any other liens senior in priority to the liens of the Agent in the Debtors' receivables or the proceeds thereof.

14. <u>No Subordination</u>. The liens on, and security interests in, the Collateral granted to the Agent under this Interim Order and pursuant to the DIP Agreement and the Loan Documents shall not be subordinated to, or made *pari passu* with, any other lien or security

interest, however and whenever arising, in the Cases or any superseding chapter 7 case, other than Valid Non-Primed Pre-Petition Senior Liens, the Bond Trustee's Priming Adequate Protection Lien and the Carveout.

15.    Automatic Perfection of Liens.

(a)    The liens and security interests granted to the Agent hereunder, under the DIP Agreement and/or Loan Documents are valid, binding, continuing, enforceable and fully-perfected with the priorities herein and therein set forth.

(b)    The Lender Parties shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the liens and security interests granted by or pursuant to this Interim Order, the DIP Agreement and/or Loan Documents.

(c)    Should the Lender Parties, in their sole discretion, from time to time, choose to file such financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral securing the Lender Debt for perfection purposes, or take any other action to protect from infringement or otherwise validate or perfect any such security interest or lien, the Debtors and their officers are hereby directed to execute any such documents or instruments as the Lender Parties shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

(d)    In the discretion of the Lender Parties, a certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording, and

such certified copy shall be deemed filed and recorded at the time and on the date of entry of this
Interim Order.

## Limitation on Governmental Offset and Other Rights.

16.    <u>Limitation on Governmental Entities</u>.  The authority of any governmental
unit (as defined in the Bankruptcy Code), including without limitation HHS, all applicable
Pennsylvania and other State Medicaid and health agencies, and the departments, divisions and
agencies thereof (a "<u>Governmental Entity</u>"), to collect pre-petition overpayments from the
Debtors shall be governed by this Interim Order.  A Governmental Entity shall have no right to
recoup provider reimbursement overpayments that were made to a Debtor from any amounts due
to such Debtor other than to recoup such overpayments that arise under the same provider
agreement or comparable applicable statutes, regulations, or arrangements, and in the same
provider cost-year as the amounts due to such Debtor arose.  No person, including but not limited
to Governmental Entities, will be permitted to obtain a lien which is equal or senior to the liens
of the Agent on the Collateral.

## Termination.

17.    <u>Termination</u>.  Notwithstanding the provisions of section 362 of the
Bankruptcy Code and without order of or application or motion to the Court, in the event of
(a) the failure of the Debtors to perform any of their material obligations under this Interim
Order, or (b) the occurrence and continuance of an Event of Default, then and upon the
occurrence of either of the foregoing (each a "<u>Termination Event</u>"), and at all times during the
continuance thereof, the Lender Parties may upon not less than three (3) business days prior
written notice to the Debtors and their counsel, the Office of the United States Trustee, counsel
for the Bond Trustee, counsel for the PBGC and counsel for the Committee(s) (and prior to its
appointment, the Debtors' thirty largest unsecured creditors on a consolidated basis) exercise any

and all rights and remedies allowed under this Interim Order, the DIP Agreement, the Loan Documents and/or applicable law; *provided, however*, that notwithstanding the foregoing and section 362 of the Bankruptcy Code, and without order of or application or motion to the Court, if a Termination Event exists, the Lender Parties may do one or more of the following at any time and in any order:   (i) reduce the amount of the Borrowing Base used in computing availability under the DIP Agreement, (ii) restrict the amount of or refuse to make Revolving Advances or Term Loans under the DIP Agreement or terminate or reduce the Lender Parties' commitment to lend under the DIP Agreement, (iii) continue to apply collections on receivables and other Collateral to the Lender Debt, and/or (iv) declare the Lender Debt to be immediately due and payable.  The Lender Parties' failure to exercise rights under this paragraph shall not constitute a waiver of any of their rights.  The Debtors waive any right to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, or to seek any other injunctive or similar relief at any time including following a Termination Event, to the extent any such relief would in any way restrict or impair the rights and remedies of the Lender Parties set forth in this Interim Order, the DIP Agreement and/or the Loan Documents; *provided* that such waiver shall not preclude the Debtors or other party in interest from contesting whether a Termination Event has occurred and is then continuing.

   18. <u>Maturity Date</u>.  In addition to any rights and remedies of the Lender Parties under the terms of this Interim Order, the Postpetition Financing shall immediately and automatically terminate and the Lender Debt shall be immediately due and payable upon the Maturity Date.

<b><u>Adequate Protection for the Affected Parties.</u></b>

19.     <u>Adequate Protection to Affected Parties</u>.  As adequate protection, to the extent of any diminution in value (if any) of the Affected Parties' liens (if any) in the Collateral following the Filing Date, the Affected Parties are granted replacement liens (the "<u>Adequate Protection Liens</u>") in all Collateral (which solely in the case of the Bond Trustee, includes Avoidance Actions after a Final Order, subject to the prior rights of the Agent and the Lenders therein); *provided, however*, with respect to the diminution in value (if any) of receivables (and the proceeds thereof) which are Collateral of the PBGC, (i) such diminution in value (if any) shall be determined solely with respect to Non-Obligated Group Receivables (as defined in the Motion), and (ii) any replacement liens respecting such diminution in value (if any) shall be only in Collateral of Debtors which are Non-Obligated Group members.  The Adequate Protection Liens shall be (i) junior in priority to the Valid Non-Primed Pre-Petition Senior Liens, the Carveout and the liens of the Lender Parties securing the Lender Debt; *provided* that until such time as the Term Loans become available for borrowing, the Bond Trustee's Adequate Protection Liens securing up to $2 million of diminution in value (if any) following the Filing Date of the Bond Trustee's Valid Non-Primed Pre-Petition Senior Lien in the Debtors' receivables and the proceeds thereof shall be senior to the liens securing the Lender Debt in the Orchard Hills Campus real property (the "<u>Bond Trustee's Priming Adequate Protection Lien</u>"); and (ii) if the replacement liens are in Collateral shared by the Affected Parties, in accordance with the ratios of the diminution (if any) in value of their respective shared Collateral following the Filing Date and subject to the provisions of the PBGC Subordination Agreement (as defined in the Motion).

20.     <u>Collection Period</u>.  For a period of 120 days following a Termination Event (the "<u>Collection Period</u>"), the Agent shall only apply proceeds of the Debtors' receivables

in repayment of the Lender Debt. During the Collection Period, all proceeds of Collateral (other than the Debtors' receivables), after satisfaction of Valid Non-Primed Pre-Petition Senior Liens, shall be retained by the Borrowers in a segregated account for the benefit of the Agent, which proceeds shall be applied in repayment of the Lender Debt immediately following the Collection Period. Following the Collection Period, the Agent may apply any proceeds of Collateral (subject to the Valid Non-Primed Pre-Petition Senior Liens) in repayment of the Lender Debt in its sole discretion in accordance with the Loan Agreement.

21.    No Filing Required. The Affected Parties shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the Adequate Protection Liens granted by or pursuant to this Interim Order. The Affected Parties shall have no right to seek or exercise any rights or remedies in respect of the Adequate Protection Liens unless the Lender Parties have consented thereto (including pursuant to intercreditor agreements with the Affected Parties) or the Lender Debt has been indefeasibly paid and satisfied in full accordance with the DIP Agreement, the Loan Documents and this Interim Order.

### Additional Adequate Protection for and
### Stipulations Regarding the Bond Trustee.

22.    Debtors' Stipulations. The Debtors stipulate and agree as follows, without prejudice to the rights of parties in interest in the Cases including any Committee(s):

(a)    The 1998 and 1999 Bonds. Certain of the Debtors, namely KP Corp., KPNC, and KPCH (collectively, the "Obligated Group") issued the Bonds through the Lehigh County General Purpose Authority in the original principal amount of $74,985,000. The Bond Trustee was granted a lien on, and security interest in, all of the Gross Receipts (as defined in the Trust Indenture for the Bonds) of the Obligated Group to secure the Bonds. The amount

of Bond debt currently outstanding is $51,310,000 plus accrued interest (the "Bond Debt"). As a result of the default by the Obligated Group in the payment of debt service on the Bonds in 2012, the Debtors, with the exception of KidsPeace National Centers of Georgia, Inc., entered into a Forbearance Agreement (the "Forbearance Agreement") dated January 11, 2013 with the Bond Trustee, consented to by the holders of the majority in principal amount of the Bonds (the "Majority Bondholders") whereby, among other things, KP Corp. executed a mortgage limited to $15,000,000 on the Debtors' Orchard Hills Campus in Orefield, PA in favor of the Bond Trustee, as mortgagee, as partial consideration for the Bond Trustee's agreement to forbear from the exercise of remedies available to it due to the defaults of the Obligated Group. The Bond Trustee also has a lien against a debt reserve fund containing two accounts aggregating $3,650,000.

(b)     The Debtors and the DIP Lenders have stipulated, admitted, acknowledged and agreed that the Bond Trustee's liens in the Gross Receipts of the Obligated Group, the Orchard Hills Campus in Orefield, PA and the debt reserve fund, as further described in paragraph 22(a) above, are valid, enforceable and non-avoidable liens. As of the Filing Date, the outstanding amount owed by the Obligated Group to the Bond Trustee respecting the Bonds was approximately $56,000,000 inclusive of accrued interest.

23.    Superpriority Administrative Expense Claim; Waiver under Section 506(c). In accordance with section 507(b) of the Bankruptcy Code, the amount of any diminution in value (if any) of the Bond Trustee's liens in the Collateral following the Filing Date shall have the status of an allowed Superpriority Administrative Expense Claim in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors,

whether heretofore or hereafter incurred, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, subject and junior only to the Carveout and the Agent's and Lenders' Superpriority Administrative Expense Claim. Except for the Carveout and the Agent's and Lenders' Superpriority Administrative Expense Claim , (i) no claim or expense having a priority senior or *pari passu* to the priority granted to the Bond Trustee in this Interim Order shall be granted or permitted in the Cases, or any superseding chapter 7 case, and (ii) no other costs or expenses of administration of any kind, nature or description whatsoever shall be imposed against the Collateral under sections 105, 506(c), or 552 of the Bankruptcy Code or otherwise, in each case, while any portion of the Bond Debt remains outstanding.

24.    Reporting Requirements to Bond Trustee. As a condition to the use of the Bond Trustee's Prepetition Collateral and Cash Collateral, the Debtors shall (i) provide to the Bond Trustee each and every document or report that they are required to provide to the DIP Lenders under Section 8.9 of the DIP Agreement at the same time they provide the reports or documents to the DIP Lenders; and (ii) comply with Article 10 of the DIP Agreement.

25.    Limitation on Use of Carveout. No portion of the Carveout may be used to prosecute actions, claims, demands or causes of action against the Bond Trustee or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection,

priority or enforceability of the liens and security interests granted to the Bond Trustee, whether prior to the Filing Date or respecting the Adequate Protection Liens granted herein to the Bond Trustee, or to validity or enforceability of the Bond Debt.

26.     Bond Trustee Events of Default.  The occurrence of any of the following events, unless waived by the Bond Trustee in writing, shall constitute an event of default (each, a "Bond Trustee Event of Default"), following which, if not cured by Debtors within 10 days following written notice by the Bond Trustee to the Debtors, the Lenders and the PBGC and their respective counsel (except in the case of clauses (c) or (d) below, for which no notice shall be required), the Debtors' authorization to use the Bond Trustee's Prepetition Collateral and Cash Collateral shall be immediately terminated:

(a)     the Debtors' failure to comply with the financial covenants set forth in Section 10.1(a) of the DIP Agreement;

(b)     the Debtors' failure to perform, in any material respect, any of their obligations under this Interim Order;

(c)     dismissal of these Cases, the appointment of a chapter 11 trustee or examiner with expanded powers in the Cases, or the conversion of a Case to chapter 7;

(d)     any stay, reversal, vacatur, or rescission of the terms of this Interim Order affecting the rights of the Bond Trustee and not consented to by the Bond Trustee; or

(e)     the occurrence of a Termination Event.

**Miscellaneous Provisions.**

27.     Reporting Requirements.  The Debtors are obligated to allow access to the Lender Parties, the Bond Trustee, the PBGC and their respective representatives and to provide information with respect to and otherwise comply with the undertakings and agreements set forth in this Interim Order, the DIP Agreement and the Loan Documents and such obligations shall

continue until the indefeasible payment in full of all Lender Debt and the Lender Parties'
commitment to loan money to the Debtors under the DIP Agreement is terminated.

28.    <u>Collection Accounts</u>.    Citizens Bank shall continue to comply with its
obligations under the Governmental Depository Agreement dated as of September 14, 2009 in
respect of Account No. 622481-XXXX and the Governmental Depository Agreement dated as of
September 14, 2009 in respect of Account No. 622351-XXXX (collectively, the "<u>Depository
Agreements</u>") including to maintain the Special Collections Accounts (as defined in each
Depository Agreement) and shall transfer all collections and proceeds of accounts receivable
deposited in the Special Collections Account in accordance with the terms of the Depository
Agreement to the Agent, in accordance with the written instructions to be provided by the Agent
to Citizens Bank.  The Agent shall assume all of the obligations of Gemino under the Depository
Agreements.

29.    <u>Binding Effect of Order; Successors and Assigns</u>.    The DIP Agreement,
the Loan Documents and this Interim Order shall be binding upon all parties-in-interests in the
Cases, including without limitation, the Lender Parties, the Bond Trustee, the PBGC, the
Committee(s) and the Debtors and their respective successors and assigns, including, without
limitation, any chapter 11 trustee or chapter 7 trustee or similar responsible person hereafter
appointed as a representative of the Debtors' estates and any such successors or assigns, without
further order of this Court and shall inure to the benefit of the Lender Parties, the Bond Trustee,
the PBGC, and the Debtors and their respective successors and assigns.  The Debtors and their
successors and assigns shall be deemed authorized and directed to comply with the provisions of
this Interim Order, the DIP Agreement and the Loan Documents; *provided*, *however*, that the

Lender Parties shall have no obligation to extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

30.    No Impairment of Liens and Order.    The liens, security interests, Superpriority Administrative Expense Claims, Lender Debt and other rights and remedies granted to the Lender Parties under this Interim Order, the DIP Agreement or the Loan Documents, and the Adequate Protection Liens and other rights herein granted to the Bond Trustee and the PBGC, and any actions taken pursuant hereto or thereto shall survive, and shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of debt by the Debtors (under section 364 of the Bankruptcy Code or otherwise), (b) the entry of an order confirming any plan of reorganization, (c) the entry of an order converting the Cases to chapter 7 or dismissing the chapter 11 case, or (d) the maturity of the Lender Debt.    This Interim Order, the DIP Agreement and the Loan Documents shall continue in force in the Cases or any superseding chapter 7 case, and the liens and security interests granted to the Agent, the Bond Trustee and the PBGC and the Superpriority Administrative Expense Claims and payment provisions contained in this Interim Order, the DIP Agreement and/or the Loan Documents shall continue in effect until (i) in the case of the Lenders, the Lender Debt is indefeasibly satisfied, paid, and discharged and (ii) in case of the Bond Trustee and the PBGC, the Cases are dismissed.

31.    Good Faith.    Having been found to be extending the Postpetition Financing to the Debtors in good faith, the Lender Parties are entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the Lender Debt and the Superpriority Administrative Expense Claims and liens created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is stayed, vacated, reversed or

modified on appeal. If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity, enforceability and priority of any of the Lender Debt or the claims, liens and security interests granted to the Lender Parties under this Interim Order, the DIP Agreement and/or the Loan Documents, and the validity, enforceability or priority of the Lender Debt and the claims, liens and security interests of the Lender Parties shall be governed in all respects by the original provisions of this Interim Order, and the Lender Parties shall be entitled to all of the rights, privileges and benefits granted herein, including, without limitation, the liens, security interests and priorities granted to the Agent in this Interim Order with respect to all Lender Debt.

32.    No Third Party Beneficiaries. Other than as expressly set forth herein, no rights are created hereunder for the benefit of any third party, or any direct, indirect or incidental beneficiary.

33.    No Marshaling. Except as set forth in paragraph 20 in no event shall the Lender Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

34.    No Waiver. Any Lender Party's delay or failure to exercise rights and remedies under the DIP Agreement, the Loan Documents or this Interim Order shall not constitute a waiver of the Lender Party's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Agreement, the Loan Documents and this Interim Order.

35.    Payments Free and Clear. Any and all payments or proceeds remitted to the Lender Parties, the Bond Trustee or the PBGC pursuant to the provisions of this Interim

Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

36.    Insurance. The Agent is deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies to the payment in full of the Lender Debt, subject as applicable to the Valid Non-Primed Pre-Petition Senior Liens and the Carveout.

37.    Automatic Stay. The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Lender Parties and the Bond Trustee to take any action authorized or contemplated by this Interim Order, the DIP Agreement or the Loan Documents and to carry out the terms thereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained in this Interim Order, the DIP Agreement and/or the Loan Documents.

38.    No Control. By consenting to this Interim Order, by making advances, loans or extending financial accommodations of any type, kind or nature under this Interim Order or by administering the loans made hereunder, none of the Lender Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtors.

39.    Exculpation.  Nothing in this Interim Order, the DIP Agreement or any other Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the Lender Parties, the Bond Trustee and the PBGC, any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  So long as the Lender Parties, the Bond Trustee and the PBGC comply with their respective obligations under this Interim Order, the DIP Agreement and the Loan Documents and their obligations under applicable law (including the Bankruptcy Code), (a) the Lender Parties, the Bond Trustee and the PBGC shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

40.    Inconsistency.  In the event of any irreconcilable inconsistency between this Interim Order and the DIP Agreement, any Document or any other agreement heretofore or hereafter entered into by and between the Debtors and the Lender Parties, the Bond Trustee or the PBGC, the terms of this Interim Order shall govern and control.

41.    Retention of Jurisdiction.  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

42.     <u>Immediate Docketing of Order</u>. The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in regard to the Cases.

43.     <u>Effectiveness</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

44.     <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

45.     <u>Notice of Final Hearing; Objections</u>.  The Debtor shall, on or before May 24, 2013 transmit copies of a notice of the entry of this Interim Order, together with a copy of this Interim Order and a copy of the Motion, to the parties having been given notice of the Interim Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for the Committee(s), once appointed.  The notice of entry of this Interim Order shall state that any party in interest objecting to the Postpetition Financing on a final basis and the entry of the Final Order shall file written objections with the Clerk of the United States Bankruptcy Court for the Eastern District of Pennsylvania no later than 5:00 p.m. on June 10, 2013 and shall serve such objections so that the same are received on or before such date by: (a) Norris McLaughlin & Marcus, P.A., 721 Route 202-206, Suite 200, P.O. Box 5933, Bridgewater, NJ 08807, Attn: Morris S. Bauer, Esq., counsel for the Debtors; (b) Kaye Scholer

LLP, 425 Park Avenue, New York, NY 10022, Attn:  Benjamin Mintz, Esq., and Stevens & Lee,

111 North Sixth Street, P.O. Box 679, Reading, PA 19603, Attn: Steven J. Adams, Esq., co-

counsel for the Lender Parties; (c) Schiff Hardin LLP, 233 South Wacker Drive, Chicago, IL

60606, Attn: Rick L. Frimmer, Esq., counsel for the Bond Trustee; and (d) the Office of the

United States Trustee for the Eastern District of Pennsylvania.

      46.    <u>Final Hearing</u>.  The Final Hearing will be held on June <u>14</u>, 2013 at <u>11:00</u> a.m.

Dated:    Reading, Pennsylvania
        May 23, 2013

                                  _____
                                  UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

## **BUDGET**

KidsPeace Consolidated
13-week DIP Budget

KidsPeace
13-Week CashFlow

| | Actual | Actual | Projection | Projection Week 1 | Projection Week 2 | Projection Week 3 | Projection Week 4 | Projection Week 5 | Projection Week 6 | Projection Week 7 | Projection Week 8 | Projection Week 9 | Projection Week 10 | Projection Week 11 | Projection Week 12 | Projection Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 05/08/13 | 05/15/13 | 05/19/13 | 05/26/13 | 06/02/13 | 06/09/13 | 06/16/13 | 06/23/13 | 06/30/13 | 07/07/13 | 07/14/13 | 07/21/13 | 07/28/13 | 08/04/13 | 08/11/13 | 08/18/13 |

**Weekly Cash Collections**
- Patient Collections
- Other Revenue
- **Total Collections**
- Revolver Fees
- **Net Collections**

**Operational Disbursements**
- Payroll
- Payroll/FICA Emp/Other
- Health & Emp/Other
- Workers Compensation
- Accounts Payable
- Other
- **Total Operational Disbursements**
- **Cashflow from Operations**
- Total Operational Disbursement (Cumulative)

- DIP Facility Fees & Expenses
- Ombudsman & Counsel
- Other
- Claims Agent
- Utility Escrow (see reserve)
- Debtor Professional Fees - Debtor
- Bondholder Professional Fees - Creditor
- Committee Professional Fees - Creditor
- **Total Other Disbursements**

- **Net Cash Flow**
- **Beginning Availability (Tranche)**

**Operating Account**
- Beginning Book Cash
- Disbursements
- Payments to Revolver
- Advances from Revolver
- Other Deposits
- **Ending Book Cash**

**DIP Account**
- Beginning Book Cash
- Disbursements
- Transfers in from Operating Account
- Transfers out to Revolver
- **Ending Book Cash**

**Note**
- Assumes Gemino replaced by Healthcare Finance Group week ending 5/26
- $750k Utility Deposit included in reserve
- The budget assumptions reflect filing are based on paying post-petition expenses and pre-petition expenses to the extent approved by the Bankruptcy Court
- Variances are permitted in accordance with the DIP Loan agreement

- Total Book Cash + Availability
- Adjusted Professional Cash
- **Adjusted Cash**
- Adjusted Loan Balance
- **Adjusted Professional fee & Utility Deposit Reserve**